

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### Southern Division


RAMON MONTEZ JACKSON,

          Plaintiff,

Case: 5:07-cv-15378
Judge: O'Meara, John Corbett
Referral MJ: Pepe, Steven D
Filed: 12-18-2007 At 11:05 AM
CMP JACKSON V. MI PAROLE BOARD, ET AL (TAM)

-vs-


BARBARA SAMPSON, Chairperson Michigan Parole
Board, JAMES ATTERBERRY, MIGUEL BERRIOS,
STEPHEN BEBOER, ARTINA TINSLEY HARDMAN,
ENID LIVINGSTON, SHAREE BOOKER, JAMES QUINLAN,
JOHN SCHLINKER, and LAURIN THOMAS,

          Defendants.

---

## PRISONER VERIFIED CIVIL RIGHTS COMPLAINT
### 42 U.S.C. Section 1983

cover sheet

## OTHER LAWSUITS OR PENDING LITIGATIONS

Plaintiff has not filed any other litigations against the defendants, nor is there any other criminal or civil matter pending involving the parties herein. Plaintiff has filed two other civil actions Pursuant to 42 U.S.C. 1983. Those action were filed in the Federal District Court Northern Division, 2:05cv-152, and the Federal District Court Western Division Action No. 4:06-cv-75.

## A. <u>INTRODUCTION</u>

1. This is a prisoner civil rights action for immediate prospective injunctive and declaratory relief against Barbara Sampson, Chairperson of the Michigan Department of Corrections Parole Board, and nine individual Parole Board members, James Atterberry, Miguel Barrios, Stephen H. Deborer, Artina Tinsley Hardman, Enid Livington, Sharee Booker, James Quinlan, John Schlinker, and Laurin Thomas. All Defendants are sued in their official capacities.

2. These claims arise out of the Michigan Parole Board's policy of determining prisoners with violent crimes unsuitable candidates for parole based solely on the nature of their crime, retrying the facts of the applicants case and resentencing the applicant to a hire offense, disregarding the parole consideration factors mandated by state laws and parole policy, issuing blanket parole denials for applicants with murder cases. The policy has been applied to Plaintiff most recently at Macomb Correctional Facility, and is an ongoing violation of federal law to which Plaintiff seeks injunctive relief.

3. Plaintiff complains that, in refusing to use the parole procedures and decision making criteria in place and which is clearly established, and by continuing to apply the arbitrary policy described above, the ongoing actions of Defendants, acting under color of state laws, violate the Due Process Clause of the United States Constitution, Amendment XIV, and is actionable under 42 U.S.C. § 1983. Without the relief Plaintiff seeks herein, he will continue to suffer irreparable harm and will likely serve the maximum amount of time allowed by state laws based on the Board's arbitrary policy.

## B. <u>PARTIES</u>

4. Plaintiff RAMON MONTEZ JACKSON has been incarcerated within the jurisdiction of the Michigan Department of Corrections ("MDOC") since June 17, 1999.

5. Originally Plaintiff was charged with the crime of First-Degree Murder, Assault With Intent to Commit Murder, and Felony Firearm on April 19, 1998.

6. Plaintiff was found guilty on June 2, 1999, before Honorable James Chylinski, Wayne County Circuit Court, of the lesser included offenses of Voluntary Manslaughter, Assault With Intent to Do Great Bodily Harm Less Than Murder, and Felony Firearm . Plaintiff was sentenced on June 15, 1999 to 6 to 15 years for manslaughter, 4 to 10 years for assault with intent to do great bodily harm less than murder, and a mandatory 2 years for felony firearm. [1]

---

[1]
    M.C.L.A. § 750.321. Manslaughter is distinguished from murder in that the element of malice, express or implied, which is the very essence of murder, is absent. <u>People v. Grillo,</u> 319 Mich 586, 30 N.W.2d 284 (1948); <u>People v. Mendoza,</u> 468 Mich 527, 664 N.W.2d 685 (2003).

1

7. Defendant BARBARA SAMPSON is the Chairperson of the Michigan Department of Corrections Parole Board at all times relevant to this complaint. The Parole Board has its principal place of business at the Grandview Plaza Building, P.O. Box 30003, Lansing, Michigan 48909. On reliable information, Defendant Sampson resides in the City of Detroit, Michigan. Defendant Sampson is appointed by the Director of the MDOC and under her direction and supervision under state laws. Under state laws, Defendant Sampson is responsible for administration and operation of the parole board, including training and supervising parole board members, appointing secretarial staff, conducting interviews, participating in parole decision making process, which is prescribed by state laws. She is sued in her official capacity.

8. Defendant JAMES ATTERBERRY is a member of the Michigan Parole Board. The Parole Board has its principal place of business at Grandview Plaza Building, P.O. Box 30003, Lansing, Michigan 48909. On reliable information, Defendant Atterberry resides in the City of Benton Harbor, Michigan. By state laws, Defendant Atterberry in his official capacity, is directly under the supervision and control of Defendant Sampson. By state laws, Atterberry's Duties include administration and operation of the parole board, including conducting interviews and participating in parole decision making process. He is sued in his official capacity.

9. Defendant MIGUEL BERRIOS is a member of the Michigan Parole Board at all times relevant to this complaint. The Parole Board has its principal place of business at Grandview Plaza Building, P.O. Box 30003, Lansing, MI 48909. On reliable information, Defendant Berrios resides in the City of Grand Rapids, Michigan. By state laws, Defendant Berrios in his official capacity, is under the direct supervision and control of Defendant Sampson. His duties include administration and operation of the parole board, including conducting interviews and participating in decision making process. He is sued in his official capacity.

10. Defendant STEPHEN DEBOER is a member of the Michigan Parole Board at all times relevant to this complaint. The Parole Board has its principal place of business at Grandview Plaza Building, P.O. Box 30003, Lansing, Michigan 48909  On reliable information, Defendant DeBoer resides in the City of Hastings, Michigan. By state laws, Defendant Deboer in his official capacity, is under the direct supervision and control of Defendant Sampson. His duties include administration and operation of the parole board, including conducting interviews and participating in the parole decision making process. He is sued in his official capacity.

11. Defendant ARTINA TINSLEY HARDMAN is a member of the Michigan Parole Board at all times relevant to this complaint. The Parole Board has its principal place of business at Grandview Plaza Building, P.O. Box 30003, Lansing, Michigan 48909. On reliable information, Defendant Hardman resides in the City of Detroit, Michigan. By state laws, Defendant Hardman in her official capacity, is under the direct supervision and control of Defendant Sampson. Defendant Hardman's duties include administration and operation of the parole board, including conducting interviews and participating in the decision making process. She is sued in her official capacity.

2

12. Defendant JAMES QUINLAN is a member of the Michigan Parole Board at all times relevant to this complaint. The Parole Board has its principal place of business at Grandview Plaza Building, P.O. Box 30003, Lansing, Michigan 48909. On reliable information, Defendant Quinlan resides in the City of Chassell, Michigan. By state laws, Defendant Quinlan in his official capacity, is under the direct supervision and control of Defendant Sampson. Defendant Quinlan's duties include administration and operation of the parole board, including conducting interviews in and participating in the parole decision making process. He is sued in his official capacity.

13. Defendant ENID LIVINGTON is a member of the Michigan Parole Board at all times relevant to this complaint. The Parole Board has its principal place of business at Grandview Plaza Building, P.O. Box 30003, Lansing, Michigan 48909. On reliable information, Defendant Livingston resides in the City of Birmingham, Michigan. By state laws, Defendant Livingston in her official capacity, is under direct supervision of Defendant Livingston's duties include administration and operation of the parole board, including conducting interviews and participating in the parole decision making process. She is sued in her official capacity.

14. Defendant SHAREE BOOKER is a member of the Michigan Parole Board at all times relevant to this complaint. The Parole Board has its principal place of business at Grandview Plaza Building, P.O. Box 30003, Lansing, Michigan 48909. On reliable information, Defendant Booker resides in the County of Wayne, Michigan. By state laws, Defendant Booker in her official capacity, is under the direct supervision and control of Defendant Sampson. Defendant Booker's duties include administration and operation of the parole board, including conducting interviews and participating in the parole decision making process. She is sued in her official capacity.

15. Defendant JOHN SCHLINKER is a member of the Michigan Parole Board at all times relevant to this complaint. The Parole Board has its principal place of business at Grandview Plaza Building, P.O. Box 30003, Lansing, MI 48909. Defendant Schlinker resides in the City of  [2]  Michigan. By state laws Defendant Schlinker in his official capacity, is under the direct supervision and control of Defendant Sampson. Defendant Schlinker's duties include administration and operation of the parole board, including conducting interviews and participating in the parole decision making process. He is sued in his official capacity.

16. Defendant LAURIN THOMAS is a member of the Michigan Parole Board at all times relevant to this complaint. The Parole Board has its principal place of business at Grandview Plaza Building, P.O. Box 30003, Lansing, Michigan 48909. By state laws,

---

2

    With his very limited resources, Plaintiff was unable to obtain the cities of the Defendants Booker, Schlinker, and Thomas.
    The information is discoverable under Rule 33 and 34.

Defendant Thomas in her official capacity, is under direct supervision and control of Defendant Sampson. Defendant Thomas's duties include administration and operation of the parole board, including conducting interviews and participating in the parole decision making process. She is sued in her official capacity.

## C. JURISDICTION AND VENUE

17. All Defendants' actions complained of herein were carried out under color of state law as state actors.

18. This action is properly brought under 42 U.S.C. § 1983, the Due Process Clause of the U.S. Const, Am XIV, to challenge parole procedures.

19. Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343(a).

20. Venue is proper under 28 U.S.C. § 1391(b) in this Court because a substantial part of the events/and or omissions occurred and are continuing to occur in the Eastern District, the Plaintiff and several Defendants reside within this district. In addition, the Plaintiff is in custody in this district, and the Defendants conduct a substantial part of their business in the Eastern District. All Defendants reside within the State of Michigan.

21. Preceding this action, Plaintiff complained to the Michigan Department of Corrections by way of its administrative grievance process, which he pursued at all levels, Steps I, II, and III.

22. The grievance was addressed at Steps I, II, and III, but not resolved. Exhibit 1.

## D. FACTUAL ALLEGATIONS

23. On April 3, 2007, the Parole Board prepared a Michigan Department of Corrections Guidelines Scoresheet ("Scoresheet") in the Plaintiff's case. See Exhibit 2.

24. The Scoresheet grouped variables into seven categories: (1) Active Sentence Score; (2) Prior Criminal Record Score; (3) Conduct Score; (4) Statistical Risk Score; (5) Age Score; (6) Program Performance Score; and (7) Mental Health Score. Id.

25. Plaintiff was assessed and received a preliminary as well as a final score of -6. This in turn calculated into an average probability of parole.[3]

---

[3]   To place itself in position to falsely represent its discretionary component, the Michigan Parole Board's practice is to keep a majority of the prisoners in the average probability range.

4

26. On May 1, 2007, Plaintiff was interviewed by the Parole Board member, Defendant James Quinlan. The interview was conducted via in-camera.

27. The interview lasted approximately 12 minutes.

28. Plaintiff's fiancee, Ms. Stephanie Rena Mial, attended the interview as Plaintiff's personal representative.

29. Also present were the following MDOC officials: Assistant Resident Unit Supervisor ("ARUS") Joe Wade, ARUS Kendal Byrd, and ARUS Regina Jenkins-Grant.

30. During the interview, Defendant Quinlan questioned Plaintiff about the facts and circumstances surrounding the crime of which he is convicted. Specifically, Defendant Quinlan asked Plaintiff to "explain what happened the morning of the offense."

31. Plaintiff explained that, two men approached me with guns, I shot both of them, and as a result one of them died.

32. Defendant Quinlan then stated that "the crime was premeditated murder, done in cold-blood."

33. Plaintiff explained that he was convicted by bench trial of voluntary manslaughter, and that he "was not trying to justify his actions" but that he "did not premeditate and kill anyone in cold-blood." Plaintiff told Defendant Quinlan that, "[i]f what you say is true that's first-degree murder of which there is no parole."

34. Plaintiff told Defendant Quinlan that he did not know the guys and had never seen them before in his life, therefore, he could not have planned or premeditated to kill them.

35. Defendant Quinlan stated that the "crime was in fact murder based on the facts, not manslaughter."

36. Defendant Quinlan further stated that, "[w]e are also referring to the fact that the Michigan Parole Board does not release murderers."

37. Defendant Quinlan then looked in the direction of Ms. Mial (Plaintiff's representative) and asked: "Do you have anything to say on behalf of this murderer?"

38. Ms. Mial stated that, "[m]y fiancee wasn't convicted of premeditated murder...," but before she could finish, Defendant Quinlan cut her off and stated that he wanted to review the Plaintiff's Assaultive Offenders Therapy Report.

39. Defendant Quinlan again asked Plaintiff "[d]o you have anything to say?"

40. Plaintiff stated: "Mr. Quinlan, I am not a cold-blood killer, I was convicted

of...," and Defendant Quinlan cut Plaintiff off.

41. Defendant Quinlan told Plaintiff that he would go back and read the assaultive offenders report, and that Plaintiff would "hear something from the Board in the next 30 to 45 days.

42. On July 10, 2007, the Parole Board, Defendants Quinlan and Livingston, made a decision to issue an 18 month continuance in Plaintiff's case.

43. Plaintiff received the Parole Board Notice of Decision on September 14, 2007. See Exhibit 3.

44. One of the Defendants participated as a third Parole Board panel member, but Plaintiff is unaware of that participants name at this time.

45. The reasons in support of its decision to continue Plaintiff in prison for another 18 months is that: "The Parole Board lacks reasonable assurance that the prisoner will not become a menace to society or to the public safety and a denial of parole is warranted with action as follows:"

46. The Board then went on to list 12 reasons in support of its decision. Id.

47. These are the exact same 12 reasons used in support of the two prior continuances the Defendants issued in this case, on August 22, 2005, and September 5, 2006.[4]

48. The Defendants also indicated on the notice its recommendations for corrective action which may facilitate release: (1) demonstrate responsible behavior by earning positive reports in any programs you may be involved in; (2) demonstrate leadership qualities by participation in department sanctioned activities; (3) identify and develop community resources to address special needs identified through group therapy.

49. To Plaintiff's knowledge, neither the Michigan Department of Corrections nor its Parole Board provides the resources or avenues necessary for Plaintiff to "identify and develop community resources to address special needs identified through group therapy."

50. If such resources exist, they were not offered to Plaintiff during his period of group therapy.

51. Plaintiff was required by the MDOC to complete 40 sessions of group therapy,

---

4

    Due to numerous transfers and mandatory "downsizing" of property mandated by the MDOC, Plaintiff does not have copies of the two previous reasons for denial of parole. However, these materials can be obtained through discovery. Rules 33 and 34.

which he successfully completed.

52. Plaintiff was admitted into group therapy on February 22, 2005 and terminated on July 20, 2005 upon successful completion. See MDOC Therapy Termination Report, Exhibit 4.

53. On page 3 of the termination report, the certified psychologist notes that, "Mr Jackson was able to receive vigorous confrontation during his case presentation and was willing to consider others comments without becoming [sic] overly defensive or resistent. He was also willing to contribute in a confrontive manner to other group members issues without being aggressive or intrusive. Mr. Jackson did not minimize or rationalize aspects of his offense or engage in overt blaming or denial. Often on the contrary he <u>expressed remorse</u> for the crime and expressed the impact it has had on his life and everyone involved. (Emphasis added).

54. The Parole Board used that "[t]he prisoner expresses little/no remorse," as one reason justifying its denial of parole. See Exhibit 3, No. 7.

55. There is no requirement that Plaintiff find a community resource in order to facilitate release; nor is it a part of the assaultive group therapy program mandated by the MDOC and taken by Plaintiff.

56. Pursuant to state law, M.C.L. 791.234(9), the parole of <u>any</u> prisoner who is eligible for parole is discretionary with the Parole Board.

57. The Michigan Legislature entrusted the decision whether to grant or deny parole to the Parole Board. M.C.L. 791.234(7).

58. The parole board's broad discretion is circumscribed to some extent by enactments of procedures for creating parole guidelines. M.C.L. 791.233e.

59. While the statute provides the framework, the Michigan Legislature also enacted provisions to create parole guidelines to govern the exercise of the Board's discretion as to the release of prisoners on parole. M.C.L. 791.233e(1)  The parole guidelines contain factors that the Parole Board shall use when making parole decisions. MDOC Administrative Rule 791.7715 and R. 791.7716

60. When Plaintiff was sentenced, a prisoner so situated had a right to appeal the Parole Board's decision to the circuit court. M.C.L. 791.234(7).

61. Pursuant to P.A. 1999, No. 191, Michigan prisoner's no longer have a right to appeal a denial of parole. The amendment was made retroactive to all prisoners.

62. The Michigan Parole Board was reorganized in 1992. The MDOC stated that "[t]he primary goal of the reorganization was to increase public safety by minimizing the number of dangerous assaultive prisoners being placed on parole." See MDOC Website, "1998 Annual Report," Exhibit 5.

63. Another stated "goal was to make the Parole Board more accountable to both the

governor and the public." Id.

64. In other statements, the MDOC said that, "[t]he parole board's mission is to keep public safety its number one priority." See MDOC Website titled: "Parole From Past to Present," Exhibit 6.

65. In the same report the MDOC declared that "policies and control of parole and the parole board have undergone dramatic changes...." Id. at 3.

66. In its "1994 Statistical Analysis Report, the MDOC named its "primary goal" as: "Protection of the people of Michigan, through the effective isolation and/or supervision of convicted felons." Exhibit 7.

67. The 1994 Report indicated that the issue of "crime and corrections eclipsed jobs and the economy as issues of greatest concern to American public opinion polls." Id.

68. The statistical report also indicates that the MDOC expects significant increases in bed space in the MDOC due to legislation enacted and legal opinions handed down in Michigan. Id.

69. In 1997, then-MDOC Director Kenneth McGinnis, prepared report titled: "Five Years After 'An Analysis of the Michigan Parole Board 1992,'" See Exhibit 8.

70. The report did a comparison of the pre-1992 Parole Board ("Old Board") to the post-1992 Parole Board ("New Board") since the overhaul in 1992 through 1997 Id. at 2.

71. According to Five Years After, the purpose of the overhaul was "[t]o reinforce public confidence in Michigan's penal system," and "to make Michigan's communities safer by making more criminals serve more time and keeping them locked up for as long as possible." Id.

72. The report boasts that "the Parole Board is less willing to release criminals who complete their minimum sentences - and is much less willing to release criminals at all, forcing many to serve their minimum sentences." Id. at 2.

73. The Five Years After report openly acknowledges that, "[t]he new parole board is much tougher on criminals, letting fewer felons back into society and clamping down hard on violent and assaultive offenders." Id.

74. The report says the "new Parole Board is far more conservative than its predecessor." Id.

75. The report justifies the Board's actions by claiming that "[t]he new Parole Board is preventing crime" and citing that "60 percent of prisoners who served their maximum sentence, and got out in 1994, were arrested within three years in connection with a new felony." Id. at 1.

76. The report calls decreasing parole approvals and forcing violent offenders to serve their court-imposed sentence two of the "most important trends, when comparing the old parole process and the new parole process... " Id. at 3.

77. The report calls this a "downward trend demonstrat[ing] that the new Parole Board is responding successfully to public demand for a tighter, less lenient system. Id.

78. The report indicates that more prisoners are serving for longer periods of time than the minimum sentence imposed by the court. Id. at 4.

79. The new Parole Board is not as willing as the old Parole Board was to grant parole to prisoners on their first eligibility date. Id.

80. The report indicates that the MDOC found it "a useful by-product: Keeping violent felons longer than their court imposed date," which "has helped the department secure more federal funding for housing assaultive offenders." Five Years After, Exhibit 8, p. 5.

81. The report indicates that the Board intents to force violent offenders to serve substantially longer periods of time. Id. at 6.

82. According to the report, "the new Parole Board feels more prisoners should be serving out the full length of their sentences and kept as long as possible. Id. at 7.

83. The report explains that the new parole board feels that "more prisoners should be serving out the full length of their sentences and kept as long as possible," because in the Board's view, they can "do as little harm as possible to society." Id. at 7.

84. The report attributes the overall trend, in large part, "to the makeup of the new Parole Board - a more conservative Parole Board," whose average new members "have backgrounds heavily grounded in law enforcement and prosecution when compared to the previous board." Id. at 10.

85. In its summary, the report boasts that the parole board shift has helped keep more violent and chronic offenders behind bars than ever before. Id. at 10.

86. Gary Gabry, the first Chairperson of the new Parole Board went on record as saying: "The new parole board was created in an atmosphere of fear." See Stuart J. Friedman, "The Michigan Parole Board: A Smoldering Volcano," 77 Mich B.J. 184-85 (1998).

87. The perceived need was to avoid inappropriate paroles... [T]he Board can read the papers; the DOC Director appoints the Board; the Governor appoints the DOC Director...," Gabry went on to explain. Id.

88. Gary Gabry also publicly announced that the Michigan Parole Board created a

9

system of injustice, one without hope, based on disparity and arbitrary decisions. See Excerpts "No Way Out," Exhibit 10, p. 1. [5]

89. Gabry said that the current parole system doesn't reward change. Id. at 2.

90. Gabry explained that a serious concern with the Board's decision-making in all cases "is the never-ending battle not to play superjudge and resentence the individual based solely on their crimes." Id. at 2.

91. Gabry also said that "[i]t's almost a natural consequence of the new board - individuals who don't have a corrections background who are suddenly sitting down and reading some pretty horrendous acts, things that happened a long time ago, but things that were assessed by a sentencing judge. That individual goes to prison and and does that time and then there's a point where the board begins to weigh in. Way too many times, even with guidelines, board members revert back to the crime and say, 'Oh, I can't believe they only got this or that. I can't believe this is what the judge gave them.'" Id.

92. Gabry said "it is the job of the board to look at what a person has accomplished while he or she was in prison...." Id. at 3.

93. In 1991, 16.5 percent of the prisoner population (about 5,992 prisoners) was serving past their court-imposed minimum sentence. See Five Year's After, Exhibit 11, p. 4.

94. By July 1997, more than 29 percent (about 11,855 prisoners) were serving past their court-imposed minimum sentence. Id. at 4.

95. In the period between 1993 through 2000, the prisoner population increased by another 9,381 prisoners. See "Prison Expansion," Exhibit 11, p. 2.

96. The total prisoner population in 2001 was 48,371; the proportion serving past their eligibility date is 44 percent, or 20,784 prisoners. Id. at 3.

97. In 2003, the prisoner population was 49,619, an increase of 45 percent from 1990.

98. See "High Cost of Denying Parole," Exhibit 12, p. 2.

99. The number of prisoners eligible for release in 2003 was 17,129, or 34.5 percent of the prisoner population. Id. at 1.

-----------------------------------------------

5

        www.capps-mi.org.

100. Plaintiff does not claim an entitlement to parole; nor does he challenge the Board's exercise of its discretion.

101. Plaintiff claims an entitlement to fair parole decision-making criteria.

102. The Michigan Parole Board is not exercising its discretion in cases of violent, assaultive offenders.

103. The Board also does not exercise its discretion in chronic offender and CSC cases.

104. In these cases, the Board issues standardized blanket denials.

105. If the Michigan Parole Board applied the laws, policies, parole standards, and practices that were in effect when Plaintiff was convicted and sentenced, it is a reasonably likelihood that he would have been paroled in 2005 after serving the minimum sentence imposed by the court.

106. All changes outlined above were intended to lengthen the prison sentence of Plaintiff.

107. The changes were also intended to abdicate the Board's exercise of discretion in violent, assaultive offender cases.

108. Another purpose of the changes described above was intended to place the parole policy in the hands of the executive branch, subject to political influence.

109. These changes have increased Plaintiffs sentence drastically, and continues to deny him meaningful parole review consideration which he was entitled to by right when he was sentenced.

110. Some of the changes in laws, policies, practices, and procedures were already in place when Plaintiff was sentenced, but were designed to lengthen his sentence, abdicate the Board's discretion, and place parole policy in the hands of the executive branch subject to political influence.

111. By the time Plaintiff was sentenced, the Board was comprised of members more likely not to vote to parole a person convicted of a violent, assaultive crime, or CSC case.


### E. <u>COMPANION CASES</u>


11

112. This case raises claims under the Ex Post Facto and Due Process Clauses similar to those raised in federal court in the cases Kenneth Foster-Bey, et al. v. John Rubitschun, et al., No. 05-71378 (Battani,J.) and Anthony Lynch-Bey v. Patricia Caruso, et al., No. 05-72378(Battani,J.).

113. This case is a companion case to the above two cases insomuch as it raises ex post facto and due process challenges, it appears substantiallly similar evidence will be offered, the same defendants are involved, and the claims here arise out of the same transactions or occurrences in those cases.

114. Plaintiff Jackson cannot say that either the Foster-Bey case or Lynch-Bey case can fairly represent him.

## F. IRREPARABLE HARM

115. Plaintiff has (and continues) to suffer irreparable harm, in that he is subject to substantive parole standards, parole laws, and policies that are designed to make him forever an unsuitable candidate for parole.

116. Some of the substantive parole standards, parole laws, and policies are far more onerous than those in effect when Plaintiff was sentenced.

117. As a result of Defendants' policies, procedures, deliberate actions, failures and omissions, Plaintiff is suffering irreparable harm.

118. There exists no plain, adequate and complete remedy at law to redress the wrongs described herein; monetary damages are insufficient to compensate for violating Plaintiffs rights not to be subjected to ex post facto laws, as well as his rights to proper, fair, parole procedures before unbiased decision-makers, under the due process clause.

119. Unless this Court grants injunctive relief, Plaintiff will be subjected to certain continuous and repeated denials of fundamental rights and suffer irreparable harm of the first order.

## G. CLAIMS FOR RELIEF

120. By virtue of the foregoing, Defendants, acting under color of state law, deliberately continue to repeatedly deny the Plaintiff fair consideration for parole based on the statutory amendments and their improper procedures, in violation of the Ex Post Facto Clause, U.S. Const., Art I, § 10, and the Due Process Clause, U.S. Const., Amend. XIV.

121. Application of the 1999 statutory amendment eliminating appeal of parole board

decisions to the circuit court violates the Ex Post Facto Clause of U.S. Constitution.

122. The Parole Board has a policy and practice of disregarding the substantive (statutory) standards in determining whether or not to parole a prisoner convicted and sentenced of a violent, assaultive offense, in violation of the Ex Post Facto and Due Process Clauses of the U.S. Constitution.

123. The Parole Board does not exercise its discretion in violent offenders, assaultive offender cases, but issues blanket denials based solely on the nature of the crime, in violation of the Ex Post Facto and Due Process Clauses of the U.S. Constitution.

124. The Michigan Parole Board is comprised of members with the philosophy, policy, and practice of denying parole to prisoners convicted and sentenced of violent, assaultive, making the Board as a whole biased and unfair, in violation of the Ex Post Facto and Due Process Clauses of the U.S. Constitution.

125. The automatic designation of Plaintiff as unsuitable for parole by virtue of the nature of crime effectively resentences him, in violation of the Due Process Clause of the U.S. Constitution.

126. The Michigan Parole Board makes decisions in violent, assaultive offender cases based in part on political and pecuniary interests, in violation of the Due Process Clause of the U.S. Constitution.

127. The actions and/or omissions of Defendant Sampson in failing to adequately train and supervise Defendants Atterberry, Berrios, DeBorer, Hardman, Livingston, Booker, Quinlan, Schlinker, and Thomas ("Parole Board"), or training so reckless or grossly negligent that future misconduct by the Parole Board is almost inevitable. Defendant Sampson exercises control or direction of the individual Parole Board members but failed to supervise them adequately. Defendant Sampson personally participates in parole board interviews and decision making in violent, assaultive offender cases while knowingly using its blanket ban on parole based on nature of crime policy, policy and practice of designating violent, assaultive offenders unsuitable candidates for parole, making decisions motivated by political and pecuniary interests, and Defendant Sampson encourages, implicitly authorizes, approves, or knowingly acquiesces in the unconstitutional conduct of the remaining individual Parole Board members. The failure of Defendant Sampson to take corrective, disciplinary or other action to stop the arbitrary abuse of discretionary powers by herself and the Parole Board members, even though she has received complaints and inquiries from Legislative Committees, Judges, Lawyers, Prosecutors, Citizens Advocacy Groups, and numerous prisoners (namely the Plaintiff) and prisoner families, which fairly made her aware of the constitutional violations alleged in this complaint. The acts and/or omissions of Defendant Sampson played a substantial part in bringing about or actually causing the injuries, and the injuries was a direct result of or reasonably probable consequence of her actions and/or omissions, in direct violation of the Ex Post Facto Clause of the U.S. Const., Art I, § 10, cl. 1, and the Due Process Clause of the U.S. Const., Am XIV.

128. The actions and/or omissions of Defendants Atterberry, Berrios, DeBoer,

Hardman, Livingston, Booker, Quinlan, Schlinker, and Thomas ("Parole Board") under the direction and control of Defendant Sampson have personally participated in Plaintiffs and other violent, assaultive offender cases using the improper procedures described above and its blanket ban on parole for violent, assaultive offenders policy and practice outlined above. Because the claims herein relates to established Parole Board policies and procedures, it cannot be said that under no set of facts can Plaintiff establish that the nine named Parole Board members, had actual knowledge and participated in the constitutional violations alleged in this complaint.

129. For all the forgoing, Plaintiff requests that the Court:

a.  Accept jurisdiction over this matter.

b.  Enter an order enjoining Defendants from using its blanket ban on parole for violent, assaultive offenders policy and procedure as applied to Plaintiff.

c.  Enter a declaratory judgment that Defendants' retroactive application of the statutory change from 1992, and 1999- to present coupled with the retroactive use of their blanket ban on parole for violent, assaultive offenders policy and procedure, violates the Ex Post Facto Clause of the United States Constitution, Art I, sec. 10, cl. 1.

d.  Enter a declaratory judgment that application of Defendants' blanket ban on parole policy and practices to violent, assaultive offenders violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

e.  Enter an declaratory judgment that the Michigan Parole Board members are biased and have a pecuniary interests in denying parole to violent, assaultive offenders, in violation of the Fourteenth Amendment to the United States Constitution.

f.  Order that Plaintiff be immediately considered for parole before a different Parole Board, one that is neutral and detached.

g.  Enjoin all Defendants to develop over a reasonably short, fixed time, not to exceed 90 days, the policies and programs necessary to remedy its violations of the Ex Post Facto and Due Process Clauses, and afford Plaintiff an opportunity to object to the Defendants' proposed policies and programs.

## H. DECLARATION UNDER PENALTY OF PERJURY

14

By his signature below, the undersigned prisoner declares that he is the Plaintiff in the above action, and that he has read the above complaint, and the information contained in the complaint is true and correct. 28 U.S.C. § 1767; 18 U.S.C. § 1621.

Respectfully submitted,

December 10, 2007

Ramon Montez Jackson #290867
Macomb Correctional Facility
34625 26 Mile Rd.
New Haven, Michigan 48048

15

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

Southern Division

―――――――――――――――――――――――――――――――――――――――――――――――――

RAMON MONTEZ JACKSON,

               Plaintiff,


-VS-


BARBARA SAMPSON, Chairperson Michigan Parole

Board, JAMES ATTERBERRY, MIGUEL BERRIOS,

STEPHEN BEBOER, ARTINA TINSLEY HARDMAN,

ENID LIVINGSTON, SHAREE BOOKER, JAMES QUINLAN,

JOHN SCHLINKER, and LAURIN THOMAS,

               Defendants.

―――――――――――――――――――――――――――――――――――――――――――――――――


PLAINTIFF'S EXHIBITS

MICHIGAN DEPARTMENT OF CORRECTIONS
**PRISONER/PAROLEE GRIEVANCE FORM**

4835-4247 10/94
CSJ-247A

Date Received at Step I    7-16-07    Grievance Identifier: M R F 0 7 0 7 0 0 7 3 1 9 6 4

> Be brief and concise in describing your grievance issue. If you have any questions concerning the grievance
> procedure, refer to PD 03.02.130 and OP 03.02.130 available in the prison law library.

| Name (print first, last) | Number | Institution | Lock Number | Date of Incident | Today's Date |
|---|---|---|---|---|---|
| Ramon Jackson | 290867 | MRF | 1-94-T | 7/11/07 | 7/14/07 | |

What attempt did you make to resolve this issue prior to writing this grievance? On what date?    On 7/12/07
If none, explain why.    I spoke to ARUS Byrd.

State problem clearly. Use separate grievance form for each issue. Additional pages, using plain paper, may be used.
Four copies of each page and supporting documents must be submitted with this form. The grievance must be submitted
to the Grievance Coordinator in accordance with the time limits of OP 03.02.130.  On 5/1/07, I was interviewd
by Parole Board member James Quinlan. During the hearing, Mr. Quinlan stated to me that my crime
was Premeditated Murder, when I'm convicted of Manslaughter. He then stated that the Parole Board
don't release murderers in Michigan. He ask my representative Stephanie Mial how she felt about me
being a murderer. Mr. Quinlan abused his discretion by changing my charge from Manslaughter to
murder, then enhanced my sentence by giving me and 18 month continuance when I was already given
two 12 month continuance, and the last 12 month continuance was served misconduct free. I was
given a 18 month continuance solely because Parole Board member Quinlan felt that I was charged
wrong by the Judge, and should have received more time. Under Federal law, I don't have a right to
parole but I do have a right to a hearing by an unbias decision maker. Mr. Quinlan was bias in my
case which denied me Due process to a fair hearing. Also, policy and administrative rules were
violated because the parole board use information that I had no knowledge of, and information that
wasn't in the Notice Of Intent to conduct a hearing to continue me!!

*Ramon Jackson*
Grievant's Signature

RESPONSE (Grievant Interviewed?  ☐ Yes  ☒ No    If No, give explanation. If resolved, explain resolution.)

Response attached.

*Julie Markham*    7/24/07    *Amy Moore*    7/25/07
Respondent's Signature    Date    Reviewer's Signature    Date
J. Markham    A. Moore
Respondent's Name (Print)    Working Title    Reviewer's Name (Print)    Working Title

| Date Returned to Grievant: 7-30-07 | If resolved at Step I, Grievant sign here. Resolution must be described above. | Grievant's Signature | Date |
|---|---|---|---|

DISTRIBUTION:   White, Green, Canary, Pink — Process to Step One; Goldenrod — Grievant

RECEIVED
MACOMB REGIONAL FACILITY
8/8/07

MICHIGAN DEPARTMENT OF CORRECTIONS
**PRISONER/PAROLEE GRIEVANCE APPEAL FORM**

4835-4248
CSJ-247 B

Date Received by Grievance Coordinator
at Step II: _____ 8-2-07

Grievance Identifier | MRF 07 07 90 73V 9/16d

**INSTRUCTIONS:**   THIS FORM IS ONLY TO BE USED TO APPEAL A STEP I GRIEVANCE.
The white copy of the Prisoner/Parolee Grievance Form (CSJ-247A) (or the goldenrod copy if you have not been provided
with a Step I response in a timely manner) **MUST** be attached to the white copy of this form if you appeal it at both Step
II and Step III.

RECEIVED MDOC
SEP 07 2007
Grievance & Appeals

If you should decide to appeal the Step I grievance response to Step II, your appeal should be directed to: _Wardens_
_office_ by _8-5-07_. If it is not appealed by this date, it will be considered terminated.

If you should decide to appeal the response you receive at Step II, you should send your Step III Appeal to the Director's
Office, P.O. Box 30003, Lansing, Michigan, 48909.

| Name (first, last) | Number | Institution | Lock Number | Date of Incident | Today's Date |
|---|---|---|---|---|---|
| Ramon  Jackson | 290867 | MRF | 1-94-Y   7/ | 11/07 | 8/2/0 |

**STEP II--Reason for Appeal** Because a thorough investigation wasn't done surrounding this matter.
Nowhere in the Step 1 response was it mention where the defendant James Quinlan was questioned
about his inappropriate conduct plus the respondent mischaracterized my grievance. I never asked
the parole board to change their decision, I simply asked for a fair hearing irregardless if the
decision remain the same. I have Constitutional Right to a fair hearing by an impartial
interviewer and based on Parole Board member James Quinlan comments about me being a murderer, and
about how the parole board don't release murderers in Michigan. It's impossible for me to have a
fair hearing with Mr. Quinlan. Also, none of my witnesses was questioned, ARUS Wade, ARUS
BYrd, ARUS Jenkins nor my representative Stephanie Mial. The step 1 respondent never address the
issue about Mr. Quinlan 's comments and his partialness.

**STEP II--Response** I have reviewed your step I response and step II appeal. You
allege that parole board Quinlan was bias toward you. The step 1 grievance was
forwarded to the Parole Board to respond to. The parole board gave you an 18 month continuance at your
last interview. Parole Board decisions are non-grievable. Parole Board members are trained professionals
and you have provided no evidence to substantiate your allegations. Grievance is denied at step II.

Response attached.

Barbara Simpson
Chairman

Hugh Wolfenbarger, Warden

**Respondent's Name (Print)**

Barbara S. Simpson   10/24/07
_[signature]_   8-27-07

**Respondent's Signature**         **Date**

Date Received by
Step II Respondent:
8/8/07

Date Returned to
Grievant:
8/30/07

**STEP III--Reason for Appeal** Because  the  Step  1  or  Step  II  respondent  never
conducted  a  thorough  investigation  into  this  matter.  None  of  the  witness  that  overheard
James Quinlan make the bias comment about me being a murderer, and the parole board not releasing
murderers in Michigan. Also, according to the grievance policy, Warden Wolfenbarger has no jurisdiction
or authority to answer a grievance on the parole board. I'm asking that I receive a new hearing based on
the biasness of parole board member Quinlan.

**NOTE:  Only a copy of this appeal and the response will be returned to you.**

**STEP III--Director's Response**  is attached as a separate sheet.

If you find the Step III Director's response unsatisfactory, you have the option of referring  the grievance to the Office of
Legislative Corrections Ombudsman, 4th Floor, Capitol Hall, 115 W. Allegan, Lansing, Michigan, 48913.

DISTRIBUTION:   White--Central Office;  Green - Canary --Step III;  Pink--Step II;  Goldenrod--Grievant

THIRD STEP GRIEVANCE RESPONSE

**RAMON JACKSON#290867**
**MRF, 07-07-00721-16c**



The Grievant alleges the Parole Board member was biased, which denied his due process to a fair hearing. He seeks a rehearing with a new Board Member as relief.

This investigator has reviewed the record presented with the Step Three appeal. All relevant information was considered. Based on this review, the response provided at Step One adequately addressed the merits of the main issue grieved.

The Grievant did not provide sufficient evidence to corroborate his allegations. The Grievant has not provided any documentation that would support an error in this determination. In addition, the record presented with the appeal does not suggest that further action is justified at this time.

This issue was referred to the Parole Board for review and response at Step Two. Therefore, the Step Three appeal is denied.

Approval Signature: _____   Date: 10/26/07

J-10-25-07-1

cc:    Warden
       Grievant

**Step I Grievance Response**
**NAME & NUMBER**                              Grievance ID#
RAMON JACKSON, #290867                          MRF-2007-07-0721-16C

---

RESPONSE (Grievant Interviewed?) Yes   ☒ No        If No, give explanation. If resolved, explain resolution.)

**Responder is not assigned at the location at which the grievant is assigned, therefore, an interview is not required.
[ref. PD 03.02.130 (AA) ].**

In your Step I grievance, you contend that the interviewing Parole Board member was biased which denied you "due process to a fair hearing".

In addressing your concerns, it is noted that the 10-member Parole Board is divided into three-member panels. Each case is assigned to a panel and the decision whether or not to grant parole is made by majority vote of that panel, not just the interviewing Parole Board member.  Your case involved the loss of life, whether or not you were charged with intent.

For the reasons provided on the Notice of Decision, the Board was unable to conclude that you would not be a risk if paroled.  The Board's decision will not be changed.

*Grievance denied.*

Julie Markham 7/24/07                          _____
Respondent's Signature        Date              Reviewer's Signature
Julie Markham                 Litigation Secretary     Amy Moore, Department Manager
Respondent's Name (Print)     Working Title     Reviewer's Name (Print)

---

Date Returned to        If resolved at Step I, Grievant sign here.   _____
Grievant:               Resolution must be described above.    Grievant's Signature          Date

---



DEPARTMENT OF CORRECTIONS                          PP-151
GUIDELINES SCORESHEET                              Date: 04/03/2007
                                                   Page 1    JMS

| Number | Prisoner's Name | Location |
|--------|-----------------|----------|
| 290867 | JACKSON, RAMON MONTEZ | MRF 1-094-T |

Term:
You will have served more than 8 years on date of consideration,
and are considered a Long Term Prisoner
=============================================================================

ACTIVE SENTENCE VARIABLES

You were scored points for the following Aggravating Conditions:

    Weapon or threat of weapon                                  ( -1 )
    There was force causing death                               ( -3 )

    Violence or cruelty beyond that necessary to commit crime(s) ( -1 )

    More than two victims threatened or involved                ( -1 )

    Victim(s) unusually vulnerable                              ( -1 )

Total Aggravating Points:                                       ( -7 )
=============================================================================

You were scored points for the following Mitigating Conditions:

NONE                                Total Mitigating Points:    ( 0 )

                          Total of Aggravating and Mitigating Points:  ( -7 )

From Active Sentence Grid -7 Points for a Long Term Prisoner
calculates to an active sentence subtotal of:                   ( -2 )

                                     Active Sentence Score:     ( -2 )
=============================================================================

PRIOR CRIMINAL RECORD VARIABLES

    Probation, delayed sentence or parole failures
    (0 = 0) (1 or more = 1)                                     ( 1 )

    On probation, parole, or delayed sentence at the time of instant
    offense, or sentenced because of a probation violation
    (no = 0) (yes = 1)                                          ( 1 )

    Juvenile commitments for non-status offense(s)
    (0 = 0) (1 or more = 1)                                     ( 1 )

MICHIGAN DEPARTMENT OF CORRECTIONS
PAROLE GUIDELINES SCORESHEET

PP-151
Date: 04/03/2007
Page 2    JMS

| Number | Prisoner's Name | Location |
|--------|-----------------|----------|
| 290867 | JACKSON, RAMON MONTEZ | MRF  1-094-T |

Total Prior Criminal Record Points:  ( 3 )

From Prior Criminal record grid 3 Points for a Long Term Prisoner
calculates to a Prior Criminal Record score of:                    ( 0 )

===============================================================================

CONDUCT VARIABLES

   Major misconducts – in the last five years of MDOC incarceration      ( 6 )

   Non-bondable major misconducts – in the last five years of MDOC
   incarceration                                                         ( 2 )

   Security classification increase – in the last five years of MDOC
   incarceration                                                         ( 1 )

                                       Total Conduct Points:   ( 9 )

From Conduct Grid 9 Points for a Long Term Prisoner
calculates to a Conduct score of:                                       ( -4 )

===============================================================================

STATISTICAL RISK VARIABLES

Your statistical Risk is Very High Assaultive Risk and
High Property Risk

From the Statistical Risk Grid: a Very High Assaultive Risk and
High Property Risk for a Long Term Prisoner calculates to
Statistical Risk Score of                                               ( -3 )

===============================================================================

AGE VARIABLE

Review Date:  11/28/2007

Birth Date:   08/16/1978

Prisoner's age at time of review: 29

From the Age Variable Grid: A 29 year old prisoner serving
a Long Term calculates to Age Score of                                  ( 0 )

===============================================================================

PROGRAMMING VARIABLES

You received a programming rating of A, At least one adequate, no inadequates

MICHIGAN DEPARTMENT OF CORRECTIONS                          PP-151
PAROLE GUIDELINES SCORESHEET                                Date: 04/03/2007
                                                            Page 3    JMS

| Number | Prisoner's Name        | Location    |
|--------|------------------------|-------------|
| 290867 | JACKSON, RAMON MONTEZ   | MRF  1-094-T |

Add a +1(plus one) if there were no inadequates and atleast two-thirds
of the programs were rated as excellent/outstanding:                    ( 1 )

From the Programming Variable Grid: a A, At least one adequate, no inadequates
rating for a Long Term Prisoner calculates to Total Programming score of:    ( 3 )

===============================================================================

                    *** GUIDELINE SCORE BY SECTION ***

===============================================================================

Active Sentence Score:                                              ( -2 )
Prior Criminal Record Score:                                        (  0 )
Conduct Score:                                                      ( -4 )
Statistical Risk Score:                                             ( -3 )
Age Score:                                                          (  0 )
Program Performance Score:                                          (  3 )
Mental Health Score:                                                (  0 )
-----------------------------------------
Preliminary Parole Guidelines Score                                 ( -6 )


SUMMARY

PRELIMINARY PAROLE GUIDELINES SCORE = -6

FINAL PAROLE GUIDELINES SCORE = -6

From the Parole Guidelines Score Grid: your guidelines score of -6
calculates to: AVERAGE Probability of Parole.

**Michigan Department of Corrections**   **Parole Board Notice of Decision**   Page 1 of 2
CFJ-279

| Name: | Number: | Location: | Mailed: |
|---|---|---|---|
| JACKSON RAMON MONTEZ | A290867 | MRF | 07/16/2007 |

**The Michigan Parole Board,** having attained jurisdiction over the sentence of the above prisoner, having considered the facts and circumstances including the prisoner's mental and social attitude, and having exercised the discretion granted by the legislature, says as follows:

☒ The Parole Board **lacks** reasonable assurance that the prisoner will not become a menace to society or to the public safety and denial of parole is warranted with action as follows:

| DECISION DATE: | ACTION: | TERM OF DENIAL: | RECONSIDERATION DATE: |
|---|---|---|---|
| 07/10/2007 | Continue | | |

29

**Regarding 30-day notice:**
Inmate waived the 30 days notice

---

**REASONS IN SUPPORT OF PAROLE BOARD ACTION:**

**Crime & Criminal Behavior**
    **The assaultive crime:**
    Involved a family member or acquaintance
    Shows a reckless disregard for life
    Resulted in loss of life
    Had multiple victims
    Involved the touching with or discharge of a weapon

    **Regarding the crime, it is our belief:**
    Prisoner expresses little/no remorse

    **The prisoner has a criminal history:**
    Of assaultive conviction(s) as juvenile
    Includes criminal conviction(s) as juvenile

**Correctional Adjustment**
    **The behavior reflected in the misconducts:**
    Shows that prisoner has received misconduct(s) since coming to MDOC or since last PBI.

| Name:                  | Number:  | Location: | Mailed:    |
|------------------------|----------|-----------|------------|
| JACKSON RAMON MONTEZ   | A290867  | MRF       | 07/16/2007 |

## Correctional Adjustment

**The prisoner's prior post conviction corrections history includes:**

- Failures in court ordered juvenile programs

## Personal History

**Regarding personal history, it is our belief that the prisoner:**

Has failed to provide a parole plan which would reduce the likelihood of additional criminal behavior

## RECOMMENDATIONS FOR CORRECTIVE ACTION WHICH MAY FACILITATE RELEASE:

Demonstrate responsible behavior by earning positive reports in any programs you may be involved in

Demonstrate leadership qualities by participation in department sanctioned activities

Identify and develop community resources to address special needs identified through group therapy

Provide additional demonstration of positive prison behavior during the period of the continuance

## *COMPLETION DOES NOT GUARANTEE A POSITIVE ACTION*

James Quinlan  6/19/2007

Enid Livingston  7/10/2007



MICHIGAN DEPARTMENT OF CORRECTIONS
CHJ 623 - THERAPY TERMINATION REPORT

FACILITY: KCF                                           SITE: KCF
COMPLETED BY: Kathleen A. Emerson, MA          07/20/2005  11:37 AM

Recommended Program: AOP

Admission Date: 02/22/2005      Termination Date: 07/12/2005      Report Date: 07/20/2005

Reason for Termination: Completed (30)

Attendance: Sessions: 40

          E = Excellent      G = Good      F = Fair      P = Poor      NA=Not Applicable

**General Group Participation:**
E  Participated in group discussions in an active and meaningful way.
E  Showed willingness to learn, and help others learn, new ways of thinking, behaving, and managing feelings.
E  Provided honest, appropriate feedback.
E  Displayed empathy for other group members.
G  Openly disclosed relevant personal information, feelings, and thoughts.
G  Actively solicited feedback from other group members.
E  Completed assignments in a timely and satisfactory manner.

**Progress Toward Goals/Objectives:**

I.   Achieve better understanding and more effective management of your criminal behaviors.
E  A.  Demonstrated the ability to clearly describe any of your criminal behaviors in detail.
E  B.  Accepted complete responsiblity for your criminal behaviors.
E  C.  Demonstrated willingness to seek and encourage feedback and support from fellow group members.
E  D.  Demonstrated ability to cope with group confrontation in non-defensive, nonthreatening and appropriate
       manner.
E  E.  Demonstrated ability to produce non-criminal, appropriate responses to hypothetical situations.
E  F.  Demonstrated an institutional record free of misconduct while enrolled in therapy.
E  G.  Demonstrated the ability to clearly explain what led to your criminal behavior.
E  H.  Prepared a comprehensive plan for managing your criminal behavior.

II.  Achieve better understanding and more effective management of feelings which seem to be connected with
       your criminal behavior.
G  A.  Demonstrated the ability to properly identify, describe and label feelings, including the physical cues
       accompanying them.
E  B.  Demonstrated the ability to clearly describe the feelings associated with past criminal behaviors.
E  C.  Demonstrated the ability to clearly explain how your feelings played a role in your criminal behaviors.
G  D.  Demonstrated the ability to distinguish between feelings of powerlessness (hurt, fear, frustration) and
       anger.
E  E.  Demonstrated a willingness and readiness to tell the other group members when you experienced

Distribution: Parole Board, Prisoner

NAME: JACKSON, RAMON M.
NUMBER: 290867
D.O.B: 08/16/1978



MICHIGAN DEPARTMENT OF CORRECTIONS
CHJ 623 - THERAPY TERMINATION REPORT

FACILITY: KCF                                    SITE: KCF
COMPLETED BY: Kathleen A. Emerson, MA            07/20/2005  11:37 AM
                    uncomfortable emotions.

E   F.   Demonstrated the ability to manage your anger both inside and outside of group sessions.
E   G.   Prepared a comprehensive plan for managing your feelings and anger.


III.  Achieve better understanding and more effective management of thoughts which seem to be connected to
      your criminal behavior.


E   A.   Demonstrated the ability to clearly describe the thoughts associated with your criminal behavior.
E   B.   Demonstrated the ability to clearly explain how your thoughts played a role in your criminal behavior.
E   C.   Demonstrated the ability to distinguish between thoughts associated with your criminal behavior and
         those which are not.
E   D.   Demonstrated a willingness and readiness to tell the other group members when you experienced
         criminal thinking.
E   E.   Demonstrated the ability to manage your criminal thinking, both inside and outside of group sessions.
E   F.   Prepared a comprehensive plan for managing your criminal thinking.


Criminal History/Etiology:
See the pre-sentence investigation report for more complete criminal history and social background information.
   The instant offense occured  on April 19, 1998, in Wayne County. According to the PSI around 0200 police
   officers responded to a radio call indicating there was a shooting. A witness stated that there was an
   argument, weapons were produced, then there was more discussion, and it appeared as if the parties involved
   were going to fight without weapons. Then according to the witness the victim put down his weapon, but the
   inmate did not, but instead fired his weapon.

Mr. Jackson states he and two men had an argument, words were exchanged and then guns were drawn. He then
   states with remorse that he shot at the guys, wounding one and taking the other man's life.

Age of first arrest was 17. Inmate's prior record was as a juvenile. He has been incarcerated since 8/14/1998 on
   the current conviction and is serving 8 - 15 years for manslaughter with a calender maximum out date of
   7/14/2015. He has no prior adult record.

Group Therapy Progress:
Program goals/objectives: Acheive a better understanding and more effective management of your offense,
   behaviors and the thoughts and feelings which seem to be connected with your offense.
The Assault Offender Program (AOP) group therapy entails weekly sessions of 120 minutes in duration that
   occur over approxtimately a calender year. This group met on Tuesday mornings from 0830-1000, in the
   Annex at Kinross Correctional Facility, in room 217. The inmate entered group with previous AOP sessions.
   The group included 13 members in addition to the psychologist. The approach cognitive-behavioral based
   primarily, also incorporating some RET, focusing upon issues of relapse prevention. Group content is mostly
   interactional, with members confronting each other at times. Group also involved some psycho-educational
   elements, inmates were givin written assignments, then they were discussed in group, these mostly addressed
   making better choices, anger management and confronting potential self-destructive behaviors. Mr. Jackson
   was also responsible for presenting "his" Relapse Prevention plan which was done on paper, presented for the

NAME: JACKSON, RAMON M.
NUMBER: 290867
D.O.B: 08/16/1978

MICHIGAN DEPARTMENT OF CORRECTIONS
CHJ 623 - THERAPY TERMINATION REPORT

FACILITY: KCF                                           SITE: KCF
COMPLETED BY: Kathleen A. Emerson, MA          07/20/2005  11:37 AM

therapist's approval, then presented to the other group members.

The time that Mr. Jackson spent in group he showed a great deal of personal growth. He did this by accepting responsibility for his crime. Discussing with the group what he did, how his thinking pattern had previously failed in making good choices. He has also come to realize that he has a great future ahead of him as long as he applies himself, and continues to pursue his goals. Over the course of group the inmate remained open minded and disclosed an abstract thought pattern, as opposed to being absolute in thinking.

Relapse Prevention Plan:

AOP leads to the development of a Relapse Prevention Plan (RPP) as the offender completed reading and writing assignments from the MDOC/BHCS AOP Manual also along with other handouts. The outlined format for the RPP is provided as well as instructions. The steps to complete the RPP include filling out the outline as a function of group processing throughout the year. Group members present their written material for consideration and feedback from the other group members.

Mr. Jackson began attending this AOP therapy group when it started, February 22, 2005. He arrived proptly and was always prepared. Although his thinking was fairly concrete during the initial stages; as the sessions progressed he displayed impressive insight into his own situation as well as willingness to reflect upon the circumstances of other group members. Mr. Jackson presented an oral description of his offense and an indepth look at the impact his crime had. He described internal and external risk factors and potential interventions for each. He completed written material in a timely manner and appeared to be sincere in his attempt to integrate others ideas and comments into his written plans for the future. He seemed to have given some thought to his written work and utilized an extensive amount of group time reporting on and processing his results. Mr. Jackson was able to receive vigorous confrontation during his case presentation and was willing to consider others comments without becomming overly defensive or resistant. He was also willing to contribute in a confrontive manner to other group members issues without being aggressive or intrusive. Mr. Jackson did not minimize or rationalize aspects of his offense or engage in overt blaming or denial. Often on the contrary he expressed remorse for the crime he committed and expressed the impact it has had on his life and everyone involved. He accepted responsibility for his crime and made pointed observations of lifestyle elements that he had adopted that contributed to his decision to commit his crime. His plans for the future include getting a job, continue his writing and be a good father. He intends on seeking out supportive therapy, may it be individual or group. Mr. Jackson participated actively in the therapeutic process and developed what is presumed to be a viable RPP.

Conclusions/Recommendations:

When released from prison, paroled or otherwise, it is recommended that Mr. Jackson continue to pursue his educational/vocational plans, therapy and other applicable support groups in the community to help him adjust to society. While remaining in prison it is recommended that he participate in amy other programming for which he is eligible to support the gains he has made. At this time AOP group is not available beyond the one-year program which he has completed.

NAME: JACKSON, RAMON M.
NUMBER: 290867
D.O.B: 08/16/1978

## MICHIGAN DEPARTMENT OF CORRECTIONS
### CHJ 623 - THERAPY TERMINATION REPORT

FACILITY:  KCF                                    SITE:  KCF

COMPLETED BY:  Kathleen A. Emerson, MA            07/20/2005  11:37 AM

_____    _____    _____
Provider Name and Title                      Provider #        Date

NAME:  JACKSON, RAMON M.
NUMBER:  290867
D.O.B:  08/16/1978

5



# Michigan Parole Board

Created by statute, the Michigan Parole Board is the paroling authority for felony offenders committed to the jurisdiction of the Michigan Department of Corrections. The board also acts in an advisory capacity to the governor for all executive clemency matters.

In 1992, Gov. John Engler ordered a reorganization of the former Parole Board. The primary goal of the reorganization was to increase public safety by minimizing the number of dangerous and assaultive prisoners being placed on parole.

Current board membership consists of ten full-time, non-Civil Service employees appointed by the director. Their backgrounds include law enforcement, sociology, law and corrections.

The Parole Board views parole as a period of supervision and testing in a community prior to release from its jurisdiction. Prisoners are not entitled to parole. Under state law, before paroling a prisoner, the board must have reasonable assurance that the prisoner will not be a risk to a community.

Jurisdiction:

The Parole Board gains jurisdiction of cases when prisoners have served the minimum sentence. In most cases, the minimum sentence is set by the judge and the maximum sentence is set by statute.

Prisoners serving life sentences are interviewed by the Parole Board after they have served 10 calendar years and every five years thereafter. Some lifers, including those serving for first-degree murder, can only be released from prison by a pardon or commutation of their sentence by the governor. However, state law provides for the possible parole of other lifers if certain requirements are met. These requirements include interest by the Parole Board, no objection from the sentencing court and a public hearing with a favorable outcome.

An average of 3.1 parolable lifers have been paroled each year for the past ten years. The average time served before parole since 1990 has been 19.9 years. The Parole Board interviews approximately 225 to 300 lifers a year.

The process:

The Parole Board is divided into three-member panels. Each case is assigned to a panel and the decision whether to parole is determined by majority vote of the panel.

The factors considered by the board in making parole decisions include: current offense, prior criminal record, institutional behavior and programming, the parole guidelines score, information obtained from the prisoner interview, if interviewed, and information from victims.

Parole guidelines use a numerical scoring system designed to assist the board in applying objective criteria to the parole decision. The criteria are intended to reduce disparity in parole decisions and increase parole decision-making efficiency.

Based on numeric scoring of the various factors, an overall guideline score is obtained. The guidelines contain numeric ranges of scores to indicate probabilities of parole.

Guidelines do not require either an automatic parole or a denial based on a numeric score but are used as a tool by the board to establish an objective guide for board members.

Parole may be ordered without an interview if the prisoner has a high parole guideline score (+ 4) and is not serving for a sex offense or a crime involving a death. Prisoners with a low parole guideline score (-13 and below) may be denied parole without an interview.

There can be a period of up to several months between the approval of a prisoner's parole and his or her actual release on parole. During that time, the prisoner's behavior is monitored. If the prisoner is involved in improper behavior during that time, parole can be suspended. Almost 800 paroles were suspended under these circumstances during 1998.

The role of crime victims

Crime victims are an important part of the parole consideration process. They are given an opportunity to participate in the process under the provisions of the Crime Victim's Rights Act. Victims and victims' family members are entitled to notification of specific actions taken by the Parole Board and to make impact statements to the board in person, by telephone or in writing. Participation by crime victims has increased dramatically during the last few years.

Issues and Trends

Since 1992, there has been a significant decrease in the parole approval rate, particularly for assaultive and violent offenders.

The number of cases considered by the Parole Board each year is increasing. The board considered more than 17,000 cases in 1997 and more than 20,000 cases in 1998, which represents an increase of almost 18 percent. The number of cases

Michigan Parole Board

considered is expected to increase even more as the department expands capacity.

Although the parole approval rate is down, the increased number of cases being considered each year has meant the number of prisoners actually being released on parole increased from 8,753 in 1997 to 10,492 in 1998.

Prisoners are filing an increasing number of court appeals to challenge parole denials by the Parole Board. Nearly 1,000 such appeals were filed during 1998. Of those appeals, five prisoners were paroled after a court ordered the Parole Board to reconsider the cases.

Processing and defending these appeals requires the use of an increasing amount of scarce resources from both the Parole Board and the Office of the Attorney General.

 

Michigan.gov Home                Site Map | MDOC Home | Contact MDOC

Search

Relate

> Juri

> The

> Par
Appl
Rate

> Par
pas

**Probation, Parole & Boot Camp**
>Location Map
>Location Directory



Victim Resources
Offender Search
Prisons & Camps
Human Resources
Publications & Information
Programs & Services
Michigan State Industries
Prison Build Program

PRINTER
friendly

## Introduction

Created by statute, the Michigan Parole Board is the sole paroling authority for felony offenders committed to the jurisdiction of the Michigan Department of Corrections. The board also acts in an advisory capacity to the governor for all executive clemency matters.

In 1992, Governor John Engler ordered a reorganization of the Parole Board and signed into law statutory changes to accomplish this reorganization. The primary goal of the reorganization was to increase public safety by minimizing the number of dangerous and assaultive prisoners being placed on parole. Another goal was to make the Parole Board more accountable to both the governor and the public.

Current board membership consists of ten full-time, non-Civil Service employees who are appointed by the director of the Department of Corrections. Their backgrounds are varied and include law enforcement, law, corrections and social work.

Michigan.gov Home | MDOC Home | Site Map | Contact MDOC | State Web Sites
Accessibility Policy | Privacy Policy | Link Policy | Security Policy

Copyright © 2001-2004 State of Michigan

34(a)






Michigan.gov Home                Site Map | MDOC Home | Contact MDOC

Search

**Related**

> Introdu

> Jurisdi

> The Pr

> Parole
  Rates



> Location Map

> Location Directory



## Parole from past to present

Parole is defined as a period of supervision and testing in the community prior to release from parole board jurisdiction. Under state law, the parole board may grant parole only if there is a reasonable assurance the prisoner will not be a menace to society or to the public safety.



The parolee is supervised by a state parole agent and the parole board may revoke the parole whenever the parolee fails to keep the terms of parole which include both standard conditions as well as any special conditions attached to the parole.

*A parole board meeting in the parole board room at Jackson State Prison 1958. From left: inmate, Fred Sanborn, Roy Nelson, unidentified parole board secretary. The secretary followed the board from site to site taking notes of each interview.*

Since 1885 there have been a variety of advisory agencies to the Governor in the matters of pardons, commutations and paroles. In 1885, the Advisory Board offered recommendations to the Governor upon applications for pardons or commuted sentences and conditional licenses to go at large (later called parole).

The State Board of Prison Inspectors took over the duties of the Advisory Board in 1891. In 1893 the state returned to the use of the Advisory Board until 1921. A Commissioner of Pardons and Paroles then replaced the Advisory Board in 1921.

In 1922 Governor Alexander Groesbeck created several new state departments. One of which, Public Safety, supervised parolees on the street. During the early 1920s the prison population increased significantly from new commitments, tightened paroles and an increase in the number of parolees returned on violations.

At this time the Governor's office controlled all paroles and pardons in the state and Groesbeck personally regulated the number of people being released from prison. During his six years as governor, Groesbeck drastically reduced the number of

**"Any prisoner in any Michigan prison is entitled to a parole as soon as the Governor becomes convinced**

3416

paroles. They dropped from an average of 48 percent to 40 percent of eligible prisoners paroled with a low in 1922 of 30 percent. Restrictions on parolees were then so strict that a person could be sent back for almost anything and Groesbeck instructed the Department of Public Safety to return as many violators as possible....................................

*that the prisoner has served time enough to satisfy the sentence and is fit to mingle again with his fellow citizens."*

**1921-22 Report of the Commissioner of Pardons and Paroles**

### A scandal uncovered

During the 1920s, the granting of parole came under increased scrutiny, since access to freedom was the biggest gift one could bestow upon a prisoner. Parole had become somewhat of a commodity and allegations arose that paroles were being bought and sold. In 1926 a grand jury was convened to investigate the sale of parole which revealed it to be the biggest business behind the walls.

Between 1932 and 1936 the state's prison population steadily declined to a ten-year low. Parolees in each year had run well ahead of new commitments. Reforms in 1937 reversed this pattern. The 1937 Public Act 255, known as the Corrections Law, again revised the parole system. The total number of paroles and the percentage of paroles granted to petitioners fell sharply.

The next change came about when the head of the parole board insisted that parole be determined according to criteria of the board's making without interference from prison officials. Paroles, always closely controlled by the governor even after the creation of a Commissioner of Pardons and Paroles, came under the control of the Assistant Director of the Bureau of Pardons and Paroles. He also headed the newly created three-member parole board.

The parole board was also placed under civil service. The three members served an indefinite term with complete authority to grant or deny parole within limits of sentence. This meant that the promise of release was taken from the governor's and warden's hands. Next came a nonpolitical parole board whose members could be removed for cause after a hearing before a bi-partisan Corrections Commission.

> **True parole is a reformative process itself, rather than a follow-up or check upon the results of prison influences.**

The corrections act also provided for an employment director to place all inmates recommended for parole. Additionally, the Bureau of Pardons and Paroles trained a legal investigator to examine the legalities of cases and to advise the parole board after his investigation.

Access to freedom was the biggest prize that a prisoner could earn and increased

access to parole was one of the eleven demands produced during the 1952 riot at Jackson prison. It stated that "a letter on prison stationery should ask the parole board to revise its procedure to give equal treatment to all inmates.

...............................................

Notable themes of the 1950s included the full implementation of individual treatment programs linked to parole. .



*Can he solve these problems alone?*

*From a 1939 parole brochure*

The importance of parole as part of an effort to reduce the population increased and a new Parole Camp was built near Jackson prison where inmates spent thirty or more days prior to being released.

...............................................

In April of 1954 a Parole Board Counseling Meeting stressed a new Counselor-Parole Board relationship. Counselors were to be seen as pre-parole preparation staff.

By the 1960s treatment programs came even more into vogue. Effective treatment programs justified early release and helped relieve Michigan's crowded prison system. Well publicized treatment programs such as the pre-parole camp, helped to justify to the public early release of convicts. The idea of treatment also substantiated the expanded use of programs.

...............................................

The changing political and social climate of the 60s and 70s began to discredit the treatment model. The system of positive reinforcement operating today was the outgrowth of that model.

**A new era**

*1938 State Prison of Southern Michigan*

In 1992, Governor John Engler ordered a reorganization of the Michigan parole board which was enacted into law. Today the Michigan parole board consists of ten full-time, non-civil service employees appointed by the Director of the MDOC. Their backgrounds are varied and include law enforcement, law, corrections and social work.

The parole board's mission is to keep public safety as its number one priority. While the policies and control of parole and the parole board have undergone dramatic changes along with the entire corrections system, the mechanics of the parole process have

remained constant for decades.

The parole board gains jurisdiction of a case when a prisoner serving a non-life sentence has served their minimum sentence, less any good time or disciplinary credits the prisoner may have earned. (In most cases the minimum sentence is set by the judge, the maximum by statute.)

The parole board is divided into three-member panels. The decision whether to grant or deny parole is made by majority vote of a parole board panel. (All cases involving a life sentence must be decided by a majority vote of the full parole board.) If the panel denies parole, a date is selected for the next parole board review.

Parole board members conduct prisoner interviews throughout facilities in Michigan. Each facility visit is for three to four days and a typical interview lasts 15 to 20 minutes.



*State Prison of Southern Michigan— west end cell block, circa 1930. Note overcrowding conditions.........................................*

During the interview, the parole board questions the prisoner about the nature of the offense, whether the prisoner accepts appropriate responsibility for their prior criminal record, their behavior and adjustment while in prison, their participation in programming and their mental health and substance abuse history.

The factors considered by the parole board in making parole decisions include :..

- the crime for which the prisoner is serving ,
- prior criminal record,
- institutional behavior and adjustment,
- programming,
- the parole guidelines score
- any information obtained from the prisoner interview and
- information from victims and other relevant sources.

The parole guidelines score, mandatory for all prisoners eligible to be considered for parole, is a numerical scoring system designed to assist in applying objective criteria to any decision made by the parole board. Information used to calculate the parole guidelines score are the prisoner's current offense, the prior criminal record, institutional conduct and program performance, age,

**Commutations, pardons and paroles, while all very different elements of the judicial and corrections process, are often confused.**
.......................................

With a commutation, the Governor converts the sentence (usually a life sentence) to a term of years which may result in the parole board getting jurisdiction. It does not guarantee release. It simply makes the prisoner eligible for parole.
A pardon is generally viewed as removing an offense from the offender's record. The Governor has the sole authority to grant a pardon. Pardons are seldom granted and normally not until the sentence has been served and a significant amount of time has passed.

mental status and statistical risk.
Michigan law and departmental
policy allows parole to be granted
without interview if the prisoner's
parole guidelines score falls in the
high guidelines category (+4 and
above), provided the prisoner is not
serving for a sex offense or a crime
involving a death.

.....................................................

Conversely a prisoner may be continued in prison without interview
if the parole guidelines score falls in the low guidelines category (-
13 and below). A full 30% of all cases fall into one of these two
categories.

Parole for life sentences is more involved. Public hearings are
required and input from victims, prosecutors and judges is
considered. Changes to the law have made prisoners serving life
under the drug lifer law eligible for parole as well. Paroles for life
sentences require a vote of the entire parole board. Non-parolable
life sentences require commutation by the governor.

Over the past 30 years an average of 8.2 prisoners per year,
serving a life sentence, have been released through the lifer law or
commutation process.

Recently a new law has revised parole eligibility for certain drug
offenses. This means that some prisoners may be eligible for
parole earlier than previously indicated. Corrections officials are
currently identifying which inmates will be eligible for parole under
the amended law.

Michigan Department of Corrections, Feb. 6, 2003

Michigan.gov Home  |  MDOC Home  |  Site Map  |  Contact MDOC  |  State Web Sites
Accessibility Policy  |  Privacy Policy  |  Link Policy  |  Security Policy

Copyright © 2001-2004 State of Michigan



# 1994 STATISTICAL REPORT

## FOREWORD

Protection of the people of Michigan, through the effective isolation and/or supervision of convicted felons, is the primary goal of the Department of Corrections.

1994 may be remembered as the year of crime and corrections in Michigan and across the nation. Those issues moved to the forefront of public and political debate. In fact, for the first time, crime and corrections eclipsed jobs and the economy as the issues of greatest concern to Americans in public opinion polls. With that as a backdrop, 1994 saw legislation enacted and legal opinions handed down in Michigan which may significantly increase bed space pressure on the department. Indeed as 1994 ends, the department finds itself with less than 500 of its 38,621 prison beds unoccupied.

This department remains committed to maximizing the use of its existing correctional resources, reserving prison beds for violent and chronic criminals, stressing credible punishment options for low level offenders, enhancing community supervision of offenders and maintaining safe, secure facilities which meet constitutional standards.

Kenneth L. McGinnis
Director
Michigan Department of Corrections



# Five Years After



# An analysis of the Michigan Parole Board since 1992

*Michigan Department of Corrections*

*September, 1997*