# FIVE YEARS AFTER

*An analysis of the Michigan Parole Board since 1992*

To reinforce public confidence in Michigan's penal system, Gov. John Engler in 1992 ordered an overhaul of the Parole Board and the way in which paroles were granted. The intent of the overhaul was to make Michigan's communities safer by making more criminals serve more time and keeping many more locked up for as long as possible.

This report is intended to summarize the impact of the overhaul five years after it was completed. The outcomes from each change made can be seen in the accompanying charts. The number of crimes prevented by changing to the new process — and the anguish those crimes would have caused — is impossible to determine.

Among the most important differences since the overhaul is a Parole Board that is much less willing to release criminals who complete their minimum sentences — and much less willing to release criminals at all, forcing many to serve their maximum sentences.

The charts and text contained herein will demonstrate several other important points:

- The new parole process is much tougher on criminals, letting fewer felons back into society and clamping down especially hard on violent and assaultive offenders.
- The new parole process scrutinizes more closely offenders who are on parole, making the system more effective and safer for the public.
- The Parole Board has expanded, is more efficient and far more conservative than its predecessor.
- Sanctions for parole violators have teeth — punishment of violators is significantly higher than under the old parole process.
- The new Parole Board is preventing crime — 60 percent of prisoners who served their maximum sentence, and got out in 1994, were arrested within three years in connection with a new felony. The Parole Board would have liked to keep them locked up longer. They got out only because courts and statutes required them to be released.

Debate will always follow the question of whether a penal system should allow paroles. There can be no question, though, of whether the overhaul has made a difference when it comes to making Michigan's communities safer and the government more accountable to its constituents.

Kenneth L. McGinnis
Director
Michigan Department of Corrections

Two of the most important trends, when comparing the old parole process and the new parole process, are reflected by overall parole approvals and the increasing number of violent felons who are forced to serve their maximum, court-imposed sentence. These charts show, more clearly than any other illustration, the fundamental difference in the two processes and the direction the new Parole Board has taken.



**% OF BOARD DECISIONS TO APPROVE PAROLE**

Chart 1

**Chart No. 1** shows a strong decrease in the approval rate for parole candidates. Simply put, this chart means that more prisoners are doing more time behind bars. The payoff, for Michigan communities, is a lower average risk that a crime will be committed by a person on parole. Of those offenders who receive parole after their first hearing, more than 70 percent are serving for non-assaultive crimes.

This is perhaps at the heart of public debate over parole — whether the system was strict enough in its examination of prisoners. The downward trend demonstrates that the new Parole Board is responding successfully to public demand for a tighter, less-lenient system.



## PRISONERS WHO HAVE SERVED LONGER THAN COURT IMPOSED SENTENCE

Chart 2

**Chart No. 2** shows more prisoners serving for longer periods of time than the minimum sentence imposed by the court. This chart is tangible evidence that the new Parole Board is not as willing as the old board was to grant parole to prisoners on their first eligibility date — sending a message that public safety, and not a guaranteed release, is uppermost in the minds of Parole Board members.

Expressed another way: only 16.5 percent of prisoners serving in 1991 were serving beyond their court-imposed minimum date. By July, 1997, more than 28 percent were serving past the minimum sentence.

The new board is also making more sex offenders serve longer past the minimum sentence imposed by the court. Since the overhaul, the sex offender population has grown rapidly — reaching record levels, both in terms of raw numbers and as a percentage of the population, almost every year.

All paroles are not the same. Example: An offender sentenced to serve five to 15 years might serve one day after the minimum date before parole, or get paroled 14 years and 363 days later — one day before the maximum date. While both cases show up as paroles in figures, the difference to the public is significant.

## PERCENT OF COURT IMPOSED SENTENCE
## SERVED FOR VIOLENT CRIMES



Chart 3

As illustrated in **Chart No. 3**, the new Parole Board is making more violent offenders serve longer past their minimum date. This trend, again, demonstrates that a premium is placed on public safety.

It also has a useful by-product: Keeping violent felons longer than their court imposed date has helped the department to secure more federal funding for housing assaultive offenders. Michigan was awarded $14.7 million in Fiscal Year 1996 for keeping the rate above 100 percent. The state expects to qualify for an additional $14 million to $15 million in Fiscal Year 1997.

## NEW FELONY ARREST WITHIN 3 YEARS OF DISCHARGE ON MAXIMUM SENTENCE



New Felony Arrest 61%

Based on cases discharged in 1994.

Chart 4

Perhaps one of the most important benchmarks of how well the Parole Board operates is to look at the population the Parole Board *refuses* to release — offenders who serve the entire length of their court-imposed sentence.

**Chart No. 4** shows that, of the prisoners forced to serve their maximum sentence since 1994, 61 percent had been arrested for new felonies by 1997. This fact clearly demonstrates the board's intent to keep those prisoners who it believes represent a threat to society for as long as possible.

Similarly it can be estimated that in 1996 alone, 966 violent felons would have been let out on parole if the overhaul had not taken place. These felons remained locked up, exposing Michigan's communities to fewer dangers for substantially longer periods of time. It is impossible to estimate what crimes they might have committed had they been paroled.



**PERCENT INCREASE IN PRISONERS SERVING MAXIMUM SENTENCE**

Chart 5

More prisoners are now serving their maximum sentence, as illustrated by **Chart No. 5.** Referring back to Chart No. 4, it is easy to see why the new Parole Board feels more prisoners should be serving out the full length of their sentences and kept as long as possible — to do as little harm as possible to society.

There is a similar increase in the number of prisoners who are serving more than 10 years for assaultive crimes. *Excluding* Life sentences, the population of prisoners serving more than 10 years has gone up more than 33 percent, to 10,000 by the end of 1996 from 7,500 at the end of 1991.

# ANNUAL RETURNS TO PRISON FOR VIOLATION OF PAROLE RULES



CHART 6

**Chart No. 6** shows the increased willingness of the department to revoke parole at the first sign of trouble. Often, this allows the department to regain control of a parolee who has not lived up to the scrutiny placed upon him or her by the department.

No other indicator is probably more reflective of the enlightened approach to corrections the department has taken in the past five to six years.

## NUMBER OF PROBATION AND PAROLE AGENTS



Chart 7

By increasing its field operations staff, the MDOC now has the ability to monitor parolees more closely and return more rule violators before they have a chance to commit a new crime. This practice puts teeth into the parole system, and it lets prisoners know that, once they are on parole they have to make a continuous effort to improve or face sanctions. It also gives the public more confidence in the system, letting taxpayers know that parole is not an easy ticket to freedom.

**Chart No. 7** strongly indicates the department did more than simply shuffle papers to overhaul a system. It invested in people, beefing up its parole and probation force by more than 50 percent since 1991.

## The Parole Board

The core of the parole process is the Parole Board, made up of 10 Michigan citizens.

The preceding charts have illustrated the positive trend taken by the new Parole Board, working within the revised and improved process. The overall trend is attributable, in large part, to the makeup of the new Parole Board — a more conservative Parole Board.

On average, these new members have backgrounds more heavily grounded in law enforcement and prosecution when compared to the previous board, all of whom were bureaucrats without such backgrounds. Appointments are now made by the director of the Michigan Department of Corrections and run for staggered, four-year terms. They are no longer part of Civil Service. This fundamental change gives the new Parole Board unprecedented accountability.

Accountability, though, would mean nothing unless there were also board members who have a long, proven background in day-to-day association with citizens.

Accomplished members of the law enforcement community bring a seasoned, professional approach to the criminal justice system. Former law enforcement officials and prosecutors, accustomed to dealing first-hand with criminals, are also able to respond well to public demand because of their background in dealing with citizens and being noticeable members of their communities.

### The members:

Stephen H. Marschke, Chairman
William A. Slaughter
John A. Hallacy
Maurice Armstrong
Barbara Queen Johnson
Margie R. McNutt
Charles E. Braddock
Andrea J. Morse
William B. Reed
Ronald E. Gach

Parole Board members held these jobs: Three police officers, one prosecutor, one victims' rights advocate, a foster care specialist, a probation supervisor, a pre-trial investigator, a prison warden and a court clerk. The average age is 46.

SUMMARY:

No amount of charts and words can demonstrate the importance of overhauling the old parole board. The shift to make offenders take more responsibility for their actions, and to suffer the consequences if they don't, has helped to keep more violent and chronic offenders behind bars than ever before.

There are an untold number of crimes that they did not commit because they were not paroled at all, were kept for longer periods of time or were returned to prison at the first sign of trouble. It is those crimes that were not committed that has helped make Michigan a better, safer place to live.



# MICHIGAN DEPARTMENT OF CORRECTIONS





Annual Report

Dear Michigan Citizens:



Much of the information usually contained in the department's annual report is now available on the MDOC Web site *www.michigan.gov/corrections*. Please visit our Web site for further details on our facilities and many of our programs.

Throughout these changing political and economic times, our mission remains clear —assure the public safety. This charge is carried out by dedicated, hard working department employees. Facing both budget challenges and personnel issues this year, these individuals have risen to the challenge.

The prison system continues to be a responsible neighbor providing many hours of community service through a record number of public works programs. Programs such as harvest gathering have provided fresh vegetables to the prison population itself as well as neighboring food banks. Inmate work crews are cleaning our parks and working in our forests. The efforts of Michigan State Industries and their partnership with Habitat for Humanity have helped to provide decent affordable housing for many Michigan families.

The Department of Corrections supports a variety of community programs and rehabilitation centers, where offenders can stay out of prison and remain as productive members of the community while receiving the support and treatment they need.

Programs such as the Special Alternative Incarceration Program (boot camp) are providing an alternative to traditional incarceration and allow a second chance for selected offenders to serve their sentence in an intensive, highly structured environment with an accelerated time line.

As we look to the future, all state departments and local governments are dealing with budget challenges and the Department of Corrections is no different. These fiscal constraints will mean a leaner, more streamlined Department of Corrections. As we work to live within our budget, we will hold tight to our mission and meet the challenge of keeping the public safety.

Sincerely,


William S. Overton, Director
Michigan Department of Corrections

# Annual Report

# Parole

## Parole



The Parole Board has the responsibility for determining which prisoners have served an adequate amount of their sentence and are no longer a threat to society.

A 2002 review of offenders that had been issued fixed date paroles and an adjustment of the dates to nonfixed release dates hastened the release of prisoners that the Parole Board had already determined to no longer represent a risk to the public. This resulted in a net saving of approximately $1.92 million.

Parole Board staff contacted the supervising parole agents for all of the inmates with life sentences who were paroled since the Parole Board was reorganized in 1992. It was discovered that every lifer either discharged successfully from parole, or remained in good standing on parole. This speaks to the extensive review and careful decision process in releasing lifers by the Parole Board.

### Victim notification

Parole board members took statements from 434 crime victims in 2002 and reviewed a total of 8,627 letters. The board is commited to ensuring that crime victims are heard and their views considered in the parole decision-making process.

The department is also commited to continued crime victim notification about the status of prisoners.

In 2002, more than 22,766 crime victims and relatives of victims as well as prosecutors and other law enforcement officials were notified of prisoners' movements in the MDOC.

Notification by the MDOC is made through written correspondence from the Crime Victim Notification Unit in Lansing. Additionally, if an escape occurs, staff at the facility where the escape occurred also notify the victim by telephone.

The MDOC currently notifies the victims upon their request of:

- The earliest parole eligibility date of a prisoner
- The release of the prisoner to Community Residential Programs (CRP) and transfers from one CRP location to another
- The transfer of a prisoner to a minimum-security facility
- Discharge of the prisoner, which is sent 90 days before the prisoner is discharged
- A public hearing regarding a reprieve, commutation or pardon of the prisoner's sentence by the Governor



or a public hearing scheduled for a prisoner serving a life sentence

- Information on the victim's right to address or submit a written statement for consideration by a Parole Board member not less than 30 days before the Parole Board begins consideration of parole
- Notice of a Parole Board decision within 14 days of the decision
- Placement in the Special Alternative Incarceration program or boot camp
- A legal name change of the prisoner
- Escape

Expecting Excellence Every Day


# Annual Report

# 2002 Facts and Figures

**Michigan prisoners:**

- 35   average age for men

- 36   average age for women

- 54.2   percent were black;

- 42.3   percent were white;

- 3.5   percent American Indians, Hispanics, and Asians

Percentage of prisoners housed at security level:

CRP : 2.2 percent
(centers and electronic monitoring)

Level I: 34.4 percent

Level II: 32.4 percent

Level III: 5.4 percent

Level IV: 11.3 percent

Level V: 3.8 percent

Level VI: (Prisoners in Level VI are generally housed in administrative segregation or detention.)

Administrative Segregation: 3.2 percent

Detention: 0.7 percent

Reception: 3.7 percent

Other special use housing such as mental health, protective segregation:  2.8 percent

Number of paroles granted in 2002: 11,733

Average role approval rate:  48.4 percent

Prison commitments: 11,047
(excluding additional sentence imposed

Yearly costs per prisoner in FY2002:

**Average:**   $24,680

**Minimum**
   Level I: $18,673

**Medium/Close:**

   Level II: $19,052

   Level III: $18,813

   Level IV: $28,057

   Multi-Level: $21,834

**Maximum**
   Level V and VI: $30,322

**Parole/Probation Supervision:** $1,839.19

E x p e c t i n g   E x c e l l e n c e   E v e r y d a y



## Ex-parole board chair labels current practices "arbitrary, unjust"

# Speakers assail treatment of parolable lifers at media roundtable

The former chair of the Michigan parole board labeled current board practices pertaining to parolable lifers sentenced in the 1960s, '70s and '80s "unjust" and "arbitrary."

Gary Gabry, a former Ionia County prosecutor, was chair of the board from November 1992, when it was transformed from a Civil Service body to one of political appointees until January 1997. He was one of four speakers at a CAPPS media round table announcing the publication of *No way out: the Michigan parole board redefines the meaning of "life".*

In hindsight, Gabry, now in private legal practice, said, "We created a system of injustice, one without hope, one based on disparity and arbitrary decisions."

The board itself redefined the Lifer Law as meaning "life means life" and decided not to calculate parole guidelines scores for lifers. Legislative changes made in 1992 increased the time at which lifers would first be seen from seven to 10 years and changed subsequent interviews from every two to every five years. Later changes in law relieved the board from ever seeing the lifer in person except once, at the first 10 years of service. Only a file review is required at five-year intervals thereafter.

Gabry said the changes in hearing schedules were made because of the backlog of lifer cases, the large number of other parole consideration cases and as a "cost expediency." But he thinks the consequences for parole decision-making have been severe.

"There is a tremendous difference between sitting down and meeting with someone who has done time and sitting in an office with wall to wall files and looking at a thick file with 20

(Continued on page 5 -- see. Speakers)

P6.1

#22

# Speakers assail treatment of parolable lifers at media roundtable

*(Continued from page 4)*

years worth of paper work in it," Gabry said. He also said the recommendation to use parole guidelines in assessing parolable lifers is very important. "Otherwise, there are no specific criteria."

Gabry also stressed that parole-eligible lifers are older and age is the best predictor of recidivism. "If you're really looking for people to parole, the board is missing the boat," he said.

Gabry noted that since board members have four year terms and don't often meet with lifers, they don't get to know them.

"In the past, the backgrounds of many members of the board were not conducive to recognizing that people do change. The system doesn't recognize or reward change," Gabry said.

Gabry explained that a serious concern with the board's decision-making in all cases "is the never-ending battle not to play super judge and resentence the individual based solely on their crimes. It's almost a natural conse-quence of the new board – individuals who don't have a corrections background who are suddenly sitting down and reading some pretty horrendous acts, things that happened a long time ago, but things that were assessed by a sentencing judge. That individual goes to prison and does that time and then there's a point where the board begins to weigh in. Way too many times, even with guidelines, board members revert back to the crime and say, 'Oh, I can't believe they only got this or that. I can't believe this is what the judge gave them.'"

*(Continued on page 12 -- see Speakers)*

PG. 2

23

# Speakers assail treatment of parolable lifers at media roundtable

(Continued from page 5)

"But," said Gabry, "it is the job of the board to look at what the person has accomplished while he or she was in prison because if you don't do that, no one has any hope. This system is going to get bigger and bigger and bigger.

"What amazes me is that decisions made on lifers almost ignore criteria the MDOC has in place, such as risk level and management level. It also amazes me that victims and prosecutors can appeal parole board decisions but prisoners have no avenue to get review of an arbitrary parole decision."

"Nowhere", Gabry said, "is there is any more disparity or arbitrariness than in the parole decision process as it pertains to the old lifer population."

Other speakers at the round table were Barbara Levine, CAPPS executive director; Dale Daverman, great nephew of the woman killed by Ross Hayes, a lifer profiled in the report, and Victoria Hollis, a former lifer now on parole.

Daverman told reporters that although he started out hating Ross Hayes, he has been working for Hayes' release since they met in 2002. He said Hayes, who was 16 at the time of the crime, has a good prison record, has earned college degrees and is a born-again Christian.

After a religious conversion in 1998, Daverman, a Vietnam vet, said his hatred of all blacks and North Vietnamese was lifted. He forgave Hayes, an African American, and they have maintained a friendship. Daverman has written to the board, legislators and the governor on behalf of Hayes and in 2004 flew in from New Mexico to attend his parole board interview. The board later voted 5 to 5 to continue Hayes until 2009, at which time he will have served 35 years.

"What more does Ross have to do to get paroled?" Daverman asked.

Victoria Hollis, paroled in 2001 after serving 24 years for second-degree murder, talked about Gladys Wilson and Monica Jahner, both profiled in the report. She said they, like her, had worked hard to complete the requirements set for them at reception and to meet the expectations of the board, yet she eventually got out and they didn't. None of them could understand why. "The lifers have no hope. They do what they are supposed to do but it makes no difference," Hollis said.

124

## PRISON EXPANSION IN MICHIGAN: A SHORT HISTORY*

1937   Model Corrections Act passed – created Department of Corrections and Corrections Commission. Commission members, appointed by the Governor with the advice and consent of the Senate, oversee Department, set policy, hire director, and appoint members of parole board, who then have civil service protection.

1939-   Prisoner population begins period at 7,703 and ends at 8,630. Fluctuations in between
1974   range from high of 10,334 in 1959 to low of 6,754 in 1966.

1963   First corrections center opens in Detroit.

**1975-1978: First wave of population growth**

Public concern about increased crime leads to more and longer prison sentences; prison population increases by 4,089 in three years to 14,944; serious overcrowding problem begins; series of new laws are enacted that will lengthen sentence and worsen overcrowding.

1977   Mandatory two-year penalty for possession of a firearm during commission of a felony takes effect; good time credits on minimum sentence eliminated for habitual offenders absent judicial consent.

1978   Drug sentencing scheme requiring judges to impose long mandatory sentences is adopted; good time credits are eliminated for all crimes committed after 12/11/78.

1979   MDOC projects need for one new prison per year for 10 years, ultimate population of 19,200.

**1979-1984: Population stabilizes at roughly 15,000; three new prisons are built**

1980   Ingham Circuit Court finds overcrowded conditions are cruel and unusual punishment – orders MDOC to meet specific space requirements.

Joint Executive-Legislative Task Force on Prison Overcrowding recommends adoption of Emergency Powers Act (EPA) to permit 90-day sentence reductions when overcrowding hits trigger points, increased use of alternatives to prison, expansion of community based programs, and building prisons; ballot proposal to raise funds for four new prisons through 0.1% tax increase is defeated; Emergency Powers Act is passed. Corrections operating costs for FY 1979-1980 are $169 million, or 3 percent of general fund budget.

---

* Prepared by the Citizens Alliance on Prisons and Public Spending (CAPPS), primarily from data published by the Michigan Department of Corrections (MDOC).

1981    Prison riots cause costly damage; state Supreme Court upholds constitutionality of Emergency Powers Act; index crime rates, which have declined and increased again over last six years, peak and begin steady decline that continues through 2000.

1981-   State budget deficits caused by recession require MDOC to cut millions from budget for
1983    three years in a row.

1982    Legislature enacts disciplinary credits of up to seven days per month.

1984    An E. Lansing police officer and a housewife are killed by a parolee released early because of Emergency Powers Act cuts and a corrections center resident. Gov. Blanchard refuses to sign further EPA reductions. Law is amended to allow more multiple occupancy of prison space. $16 million appropriated to begin major prison acquisition and construction program.

## 1985-1992: Second wave of prison growth

State builds 23 prisons, including "temporary" pole barn facilities. Prison population grows by 23,970 (average of 3,000 add'l. prisoners per year; 164% increase in eight years). Parole board temporarily decreases parole grants. Proportion of parolees returned to prison for technical parole violations doubles from 9.2 percent in 1984 to 18.3 percent in 1989, then drops back to 13.3 percent.

1988    Legislature establishes Office of Community Corrections to fund local programs designed to divert prison-bound offenders and Special Alternative Incarceration (SAI or boot camps) for probationers and some prisoners.

1989    Proportion of population serving beyond their parole eligibility date is 18 percent -- 5,746 prisoners.

1991    Gov. Engler abolishes Corrections Commission, assumes authority to set policy and appoint director. Technical rule violator centers (TRVs) are established; 90-day commitments of parolees who violate rules of supervision are designed to be cost-effective alternative to returning parolees to prison. Corrections costs for FY 1991-92 are $887 million.

1992    Parolee rapes and murders four Oakland County girls; civil service parole board is replaced by members appointed by director to four-year terms and subject to removal for "incompetency, dereliction of duty, malfeasance, misfeasance, or nonfeasance in office."

## 1993-2000: Third wave of prison growth

10 more new prisons are opened by MDOC; Michigan Youth Correctional Facility is opened by Wackenhut Corp. in 1999; Bellamy Creek is built but not opened. Construction costs = $447 million. Population increases by 9,381.

Number of prisoners in community corrections centers and on tether drops from all-time high of 3,497 in 1992 to 2,468 in 1993, then declines to 1,873 by 2000.

Parole rates plummet from 63.3 percent to 47.3 percent. Parole revocations for technical violations increase sharply, especially after 1995. Technical parole violators returned to prison rise from 1,916 in 1995 to 3,122 in 2000, while the number of parolees sent to Technical Rule Violator centers rises simultaneously from 1,332 to 2,341. In 2000, 40.6 percent of entire parolee population has either been returned to prison for a technical violation or sent to a TRV. An additional 8.5 percent were returned to prison for being convicted of new crimes.

1997   Proportion of population serving beyond their parole eligibility dates is 29 percent -- 12,778 prisoners.

1998   Legislature adopts sentencing guidelines and "truth in sentencing" (TIS). Guidelines, which set longer minimum sentences for assaultive offenders but steer less serious offenders to community sanctions, are expected to have neutral effect on prison capacity. Truth in sentencing bars prisoners from community placements until they have served their entire minimum sentence and eliminates all disciplinary credits for prisoners sentenced after effective date. TIS is expected to increase average sentence length by 1.16 years and to require 5,400 new beds by 2007.

## A Glimpse of the Future

2001   Total prisoner population is 48,371. Proportion serving beyond their parole eligibility date is 44 percent, or 20,784 prisoners. MDOC renames seven "temporary" facilities to reflect reality that they have become permanent. MDOC spokesperson acknowledges that all growth in prison population in 1990's is due to changes in parole board policies.

2002   Michigan Reformatory and State Prison of Southern Michigan are closed, but Bellamy Creek facility is opened. Number of prisoners in community programs drops to 1,132. Legislature votes to eliminate mandatory sentences for drug offenders and provides earlier parole eligibility for prisoners previously sentenced under mandatory laws. Budget cuts result in elimination of several behavior modification and substance abuse treatment programs for prisoners.

2003   Despite implementation of virtually all possible double-bunking, MDOC projects it will run out of beds late in year if current trends continue. Population projection of 58,000 by 2006 does not even include full impact of sentencing guidelines and truth in sentencing on average sentence length. Governor's recommended budget of $1.72 billion for FY 2003-2004 includes staff reductions, assumes wage concessions, and eliminates academic programs for all maximum security prisoners. House votes to reduce all prisoner educational programs by another $8.5 million. For first time, MDOC appropriation will exceed that for colleges and universities. Meanwhile, MDOC pays $60,000/month to truck sewage from women's prison camp in Brighton because expansion of facility exceeded capacity of septic field.

12

# The high cost of denying parole:

## an analysis of prisoners eligible for release





CAPPS

ITIZENS ALLIANCE ON
PRISONS & PUBLIC SPENDING

# The high cost of denying parole:
## an analysis of prisoners
## eligible for release

*November, 2003*



**CAPPS**
*CITIZENS ALLIANCE ON*
*PRISONS & PUBLIC SPENDING*

The high cost of denying parole: an analysis of prisoners eligible for release

# Contents

| | |
|---|---|
| Executive Summary | 1 |
| Why we should examine our prisoner population | 3 |
| Determining the actual time served | 3 |
| The Legislature's role in defining the boundaries | 3 |
| Sentencing guidelines | 4 |
| The role of the court in setting the minimum | 5 |
| The parole board's role | 5 |
| Purpose of parole | 5 |
| The parole board, then and now | 6 |
| Parole process | 6 |
| Parole guidelines | 8 |
| Summary | 8 |
| The parole-eligible prisoners: analyzing the data | 9 |
| "Fixed Date" paroles | 12 |
| Technical parole violators | 17 |
| Prisoner Profile: Charles Lohn | 19 |
| Parole denied | 27 |
| Prisoner Profile: Jan Borek | 30 |
| Parolable lifers | 35 |
| Prisoner Profile: Gladys Wilson | |
| Observations on race and gender | 37 |
| Saving money safely | 42 |
| CAPPS recommendations | 44 |
| Conclusion | 47 |
| Methodology | 50 |

Additional copies of this report may be purchased for $6, including shipping. The full report is also available on the CAPPS website: www.capps-mi.org

Citizens Alliance on Prisons and Public Spending
115 W. Allegan St., Suite 950
Lansing, MI 48933
Tel: 517-482-7753
Fax. 517-482-7754
capps_mi@ameritech.net

Citizens Alliance on Prisons and Public Spending

# The high cost of denying parole: an analysis of prisoners eligible for release

*Prepared by Citizens Alliance on Prisons and Public Spending*

November, 2003

## Executive Summary

In 1992, Michigan changed from a parole board whose members were corrections professionals to one comprised of political appointees. The current board has adopted numerous policies and practices that lengthen the time prisoners serve.

- Parole grant rates dropped from 68 to 48 percent.

- Far more paroles are revoked for technical violations of parole conditions and the parolees who are returned to prison are kept much longer before being released again.

- Prisoners serving parolable life terms who became eligible for release after serving ten years are being denied parole on the rationale that "life means life."

- Even prisoners granted parole continue to fill scarce prison beds because the board has fixed a date for their release months into the future.

The result of these policies is that nearly 35 percent of all Michigan prisoners – 17,129 people – have served the time required by law for their offenses. Their continued incarceration is the result of discretionary parole board decisions. The annual cost to taxpayers for the entire group is approximately $497 million.

CAPPS obtained the MDOC's prisoner database under the Freedom of Information Act. This snapshot of all the prisoners and parolees under MDOC supervision on May 6, 2003 provides substantial insight into who the parole-eligible prisoners are, how many of them might be released without significant risk to the public, and how much money could then be shifted from Corrections to other state services.

A total of 1,428 prisoners have been granted parole but have not yet left prison. Of these, 965 had "fixed-date" paroles that required them to spend an average of four additional months in prison at a cost of over $7 million. The prisoners given fixed-date paroles cannot be readily distinguished from those who are released when parole is granted. It is unclear how the public gains any increased safety from delaying the release of prisoners already determined to be suitable for parole.

Over 20 percent of the parole-eligible prisoners are technical parole violators. Over half of this group

---

## Acknowledgments

In 2001, the Citizens Alliance on Prisons and Public Spending (CAPPS) sought information from the Michigan Department of Corrections (MDOC), under the Freedom of Information Act, regarding the prisoners who continue to be incarcerated even though, by law, they are eligible for parole. CAPPS was seeking to learn who these prisoners are, on what basis they are currently imprisoned, and what the apparent risk of releasing them would be. The MDOC replied that no such information had been compiled.

CAPPS proceeded to develop this information itself. With a generous grant from the JEHT Foundation, it purchased a copy of the Corrections Management Information System (CMIS) database and arranged to have it analyzed.

Jeffrey Anderson, an employee of the MDOC's Office of Research and Planning, restructured the database. Mr. Anderson's outside employment by CAPPS was approved by MDOC management on the condition that his services were limited to database restructuring.

Terrence H. Murphy, MDOC's Chief of Research and Evaluation for the MDOC from 1986 until his retirement in 2002, conducted the data analysis. Mr. Murphy, who completed extensive doctoral work in deviance, methods and social psychology, conducted substantial research for the MDOC in the areas of evaluation, risk prediction and prisoner classification systems.

Mr. Murphy conducted the initial data analysis according to specifications provided by CAPPS and additional analyses throughout the project as issues became more refined. He also clarified specific technical and historical matters, such as the evolution of fixed date paroles and the impact of length of time served on bedspace.

Barbara R. Levine, Executive Director of CAPPS, authored the report. She is solely responsible for the interpretation and presentation of the results of the data analysis. Ms. Levine, a member of the State Bar of Michigan since 1974, has extensive experience addressing corrections issues in various capacities.

Gail Light, who was employed by the MDOC Office of Public Information for 27 years, designed and produced the report. Ms. Light also provided substantial editorial assistance. Dena Anderson prepared the prisoner profiles and also assisted with editing.

A generous contribution from Mr. A. W. Hemmings greatly assisted in the printing and distribution of this report.

## The high cost of denying parole: an analysis of prisoners eligible for release

were initially convicted of non-assaultive or drug offenses. Although they have not been convicted of any new offenses while on parole, they are returned to prison for an average of 24 months for failing to comply with conditions of supervision. The annual cost of incarcerating these 3,645 technical violators is over $81 million. With a combination of progressive sanctions and increased support services, many of these prisoners could be supervised adequately in the community for a tenth of the cost.

Over 11,000 prisoners have passed their earliest release date (ERD) and been denied parole. Nearly 4,300 are more than three years past their ERD. In about half these cases it appears that the justification for denial may be a history of poor institutional conduct.

The remaining prisoners are older, have fewer prior felony convictions than those who are granted parole, and have good institutional conduct. The majority are housed in minimum security facilities. These prisoners are primarily being denied parole because of their offenses. Most are serving for a variety of sexual or assaultive offenses.

For the parole board to lengthen the time a prisoner must serve based solely on the type of offense is an expensive and questionable practice. The nature of the crime is fully considered when the minimum sentence is set in the first place. The MDOC's own data tends to show that offenders in these categories actually have lower recidivism rates than other offenders. No data indicates that holding aging prisoners long past the completion of their minimum terms increases public safety. If the parole board simply substitutes its judgment for that of trial court and the legislators who adopted sentencing guidelines, it is effectively engaged not in risk assessment but resentencing.

Paroling just 30 percent of the prisoners who have served their minimum terms and been denied release would save nearly $69 million.

The 864 parole-eligible lifers are, as a group, much older prisoners with good institutional records. While their median age now is 49, two-thirds were 28 or younger when they committed their offenses. Nearly 30 percent were 20 or younger; 72 were ages 15 to 17. They have served, on the average, 22 years. About half were convicted of second-degree murder; most of the rest were convicted of criminal sexual conduct, armed robbery or other assaultive offenses. Many were sentenced before sentencing guidelines took effect and would not receive life terms today.

Although the judges who imposed these sentences assumed meaningful parole review would occur after 10 years, these lifers are being denied release because they are lifers not because they continue to pose a risk to public safety. The parole board does not even calculate parole guidelines scores for lifers to assess their risk. Based on revised procedures adopted in 1999, the board reviews a lifer's file once every five years and decides whether it wants to even interview the person. If the board decides it has no interest in proceeding toward release, it is not required to give reasons for that decision. The prisoner has no right to appeal.

Each time a lifer is continued for five years, the cost to taxpayers is at least $112,500. If only 250 of these lifers were placed on parole, the annual savings would be over $5 million.

---

## The high cost of denying parole: an analysis of prisoners eligible for release

The data suggest that Michigan has gone further than is necessary for public safety in refusing to release parole-eligible prisoners. If 77,200 of these prisoners -- fewer than 45 percent -- were placed on parole, the savings to taxpayers would be more than $145 million.

The report includes numerous recommendations for how the parole decision-making process can be improved so that thousands of prisoners who are not likely to re-offend are not unnecessarily warehoused for years. Some of these recommendations involve statutory changes that would place clear boundaries on the parole board's exercise of its currently unlimited discretion.



## Why we should examine our prisoner population

Of all the discretionary funds Michigan has for services ranging from public health to higher education, programs for children and the elderly, the environment, the arts and local revenue sharing, it spends 18 percent — $1.72 billion — on the Department of Corrections (MDOC). Corrections' share of the general fund budget has nearly quadrupled since 1983 and now surpasses that of colleges and universities. Corrections accounts for 32 percent of all state employees; Michigan taxpayers spend more than $3.3 million a day just to pay their salaries.

A portion of the MDOC budget goes to supervising probationers and parolees, but the lion's share is used to operate 42 prisons and 10 prison camps. Although the exact amount varies depending on the prisoner's security level, when medical and mental health care costs are included, the average annual cost per prisoner is roughly $29,000.

Corrections spending has skyrocketed because the prisoner population has grown so rapidly. In December 1990, it was 34,209. On May 6, 2003, when the snapshot analyzed in this report was taken, it was 49,619 — an increase of 45 percent. Although other important factors exist, the single biggest reason for prison growth has been changed parole practices. Far more people who have served their minimum sentence and are, by law, eligible for release, are being denied parole. Far more people who were released but violated a term of their supervision are being kept in prison as "technical parole violators." Hundreds of people are even being granted parole but given release dates months into the future, filling expensive prison beds in the interim.

In just 12 years, the number of prisoners eligible for release has nearly tripled and their proportion of the total population has more than doubled.

### Increases in parole-eligible prisoners

| | Eligible for Release | Proportion |
|---|---|---|
| 1991 | 5,992 | 16.5% |
| 1997 | 12,778 | 28.5% |
| 2003 (May) | 17,129 | 34.5% |

As Michigan faces its worst budget crisis in decades, it must make hard choices about how to cut hundreds of millions of dollars in state spending. While the sheer size of the MDOC budget makes it an obvious place to look, lawmakers tend to believe that Corrections is essentially untouchable because it takes X dollars to house Y prisoners. The assumption is that we are incarcerating the 50,000 most dangerous men and women in the state, and the MDOC budget is the inviolable price of public safety. There has been little effort to examine just who we are paying to keep in prison and whether they actually all must remain there to keep us safe.

Case 5:07-cv-15378-JCO-SDP   ECF No. 1-2, PageID.30   Filed 12/18/07   Page 30 of 43

This report suggests answers to these questions and offers recommendations for improving the parole process. It also demonstrates how, if fewer than half the prisoners currently eligible were paroled, the MDOC budget could be reduced by more than $145 million that could then be made available for other state services.

To assess these conclusions and follow the data analysis readily, the reader needs a basic understanding of how sentencing and parole work.

## Determining the actual time served

An indeterminate prison sentence is one that sets both a minimum and maximum amount of time a person can serve. In Michigan's system of indeterminate sentencing, each branch of government has a role. The Legislature sets the maximum penalty for each type of offense. The trial judge sets the minimum sentence the particular defendant must serve. And the parole board, a part of the executive branch, decides when a prisoner who has served the minimum sentence will actually be released. While these actions collectively determine how long a person will be incarcerated, beneath the broad definitions lie important details.

## The Legislature's role in defining the boundaries

The Legislature has absolute authority to set the penalties for crime. It can delegate some of its power to judges and the parole board, as it typically does. However, the Legislature can also eliminate judicial and executive discretion by mandating specific sentences, such as a flat two years for committing a felony with a gun or mandatory life without parole for first-degree murder. The Legislature can also mandate that a minimum term of at least a certain length be imposed, as it did for most drug offenses until recently. Conversely, the Legislature can give total discretion to courts to set both the minimum and the maximum sentence. Many of the most serious offenses in Michigan carry "life or any term," which allows the sentencing court to impose a parolable life term or any minimum and maximum terms the court chooses.

The Legislature can also choose to put limits on the discretion it delegates. In fact, statutes require the use of sentencing guidelines by judges and parole guidelines by the parole board, though the impact of each is very different.

## Sentencing guidelines

In 1998, the Legislature adopted sentencing guidelines developed by a special commission. The guidelines are designed to insure that the punishment is proportional to the crime, and that people with similar prior records, who have committed similar offenses, are similarly treated.

The sentencing guidelines award points according to the seriousness of the offense and the offender's



---

### Parole-Eligible Prisoners



Legend:
- Denied parole 65.5%
- Technical parole violators 21.3%
- Parolable lifers 4.9%
- Granted parole but not released 8.3%

(11,223)

(3,645)

(834)

(1,428)

This report focuses on the 17,129 prisoners the parole board has the discretion to release. It divides these prisoners into four groups: granted parole but not yet released (1,428), eligible for parole but denied (11,223), technical parole violators (3,645), and parolable lifers (834). A separate subsection describes each group and examines the reasons for not releasing them that appear from the data. Also addressed are how these prisoners scored on the board's own parole guidelines and how long they have been eligible for release.

The data analysis raises hard questions:

- What are the appropriate roles of the Legislature, the sentencing court and the parole board in determining how long an offender should stay in prison?
- Should we imprison people only to pay for crimes they committed in the past or to prevent crimes they might commit in the future?
- Is it cost-effective to return people to prison who violated the rules of community supervision but did not commit new crimes?
- Is the parole decision-making process sufficiently fair and transparent? Should the board be more accountable?
- Are the human and fiscal costs of harsher parole policies justified by measurable gains in public safety?
- Would we actually enhance public safety by shifting some resources from incarceration to services that prevent crime, such as mental health and substance abuse treatment, pre-school and K-12 education, services to at-risk children and more support for prisoners re-entering the community?
- Instead of just containing prison growth, can we actually reduce the prisoner population and close prisons designed to be temporary more than a decade ago?

criminal history. Offense factors include not only the general type of crime, but the offender's role, the extent of actual harm to people or property, the use of a weapon, and the relationship between the offender and victim. Criminal history weighs both the number of adult and juvenile convictions and their severity. Points are also added if the offender was or had recently been on probation or parole. The total number of points determines the sentencing range.

Under the guidelines, less serious offenders are "locked out" of prison and must be sentenced to community-based sanctions. At the other extreme, average prison terms for the most serious offenders were made longer. By statute, a key consideration in setting the sentencing guidelines was the capacity of the state prison system.

## The role of the court in setting the minimum

The length of the minimum sentence can be determined in the trial court by two methods. A defendant who pleads guilty may be permitted to negotiate with the prosecutor for a particular sentence. If the judge approves, that is the sentence that will be imposed.

A defendant who pleads guilty gives up the right to a trial in exchange for the benefit of his or her bargain. Sometimes that simply involves reducing the maximum exposure by having charges reduced or dismissed. However, when the bargain is for the minimum sentence, it is the value of the minimum that makes the plea knowing and voluntary. Since roughly 90 percent of all convictions are obtained by plea, the integrity of the plea bargaining system is critical to the operation of the criminal justice system.

Absent a sentence agreement, the judge selects the sentence after reviewing a presentence investigation report (PSI) and calculating the sentencing guidelines. The PSI describes the offense, the offender's background, and the impact of the offense on the victim. Judges must select a minimum sentence within the guideline range, unless they have a substantial and compelling reason to deviate or depart. Departures cannot be based on factors already counted in the guidelines. Prosecutors may appeal downward departures and defendants may appeal upward departures to a higher court. A large body of judicial decisions defines when judges' reasons meet the "substantial and compelling" tests. Defendants may also appeal errors in the guidelines scoring or reliance on inaccurate information.

In the trial court, the minimum sentence represents the bottom line. Defendants and victims know the offender will serve at least that much time. Judges must insure that the minimum reflects adequate punishment for the crime, considering both aggravating and mitigating circumstances and the offender's prior record. Whether through plea negotiations or advocacy at the sentencing hearing, prosecutors and defense attorneys try to insure that the sentence reflects their views of what is fair and proportional. Since the prisoner can be paroled at any time thereafter, the participants at the trial court level treat the expiration of the minimum as the presumptive release date, subject to post-sentencing events. The sentencing guidelines, which were developed specifically to address only the minimum sentence, rest on the same assumption.

---

## The parole board's role

### Purpose of parole

Once the prisoner has served the judicially imposed minimum, the parole board obtains jurisdiction. It then has virtually unfettered discretion to grant or deny release, subject to the statutory mandate that the board have reasonable assurance that the prisoner will not become "a menace to society."

Parole is conditional release, typically for two years. The parolee must meet the terms of supervision or risk being returned to prison for any period of time up to the maximum sentence. If the board chooses never to grant parole, the prisoner must serve the maximum, at which point he or she must be discharged.

The primary purpose of parole is to protect the public by providing a structured re-entry to society at the proper time for each individual prisoner. Parole can deter re-offending not only through supervision, but by assisting parolees with their needs in the community, such as housing, employment, substance abuse treatment and medical or mental health care. (Keeping prisoners until they serve their maximum sentences is arguably more dangerous to the public, since discharged prisoners go directly into the community without any supervision or assistance.) By basing release partly on in-prison conduct, parole also adds institutional management. By changing rates of movement through the back door, parole also affects the need for prison beds.

### The parole board, then and now

Until late 1992, the parole board was comprised of seven experienced corrections professionals who were subject to civil service regulations. In 1992, the membership was changed to ten political appointees. Until October 2003, five of the members had law enforcement backgrounds. None had worked as prison management or staff.

While prisoners were never automatically released as soon as they were eligible, historically, prisoners who behaved well and were judged not to be currently dangerous could expect parole. The "old" board released 68 percent of prisoners at their earliest release date (ERD). Prisoners were encouraged to believe they could earn their release. At parole interviews, board members looked for positive signs of growth and change. Holding people to serve the statutory maximum was uncommon.

The "new" board has a much different philosophy. Rather than paroling on the minimum sentence unless there is a clear reason not to, this board tends to revisit the crime and reject minimum sentences with which it disagrees. Thus, in a 1997 report entitled "Five Years After," which highlighted the differences between the prior and current boards, then MDOC Director Kenneth McGinnis stated: "Among the most important differences since the overhaul is a Parole Board that is much less willing to release criminals who complete their minimum sentences – and much less willing to release criminals at all, forcing many to serve their maximum sentences."



The report stressed the current board's particular unwillingness to release people who committed sex offenses, its tough stance on assaultive offenses, and its quickness to revoke parole "at the first sign of trouble." The report bemoaned the fact that some prisoners the board "would have liked to keep ... locked up longer" had to be discharged after serving their maximum sentences "only because courts and statutes required them to be released."

The new approach achieved its intended consequences. The overall release rate dropped from 68 to 48 percent. For sex offenders, in 2002, it was 10 percent. Also in that year, about 1,500 prisoners (14 percent of the total released) "maxed out." The number of technical parole violators returned to prison climbed from 1,660 in 1992 to 3,293 in 2002. [1] Technical parole violators are also being kept longer before being re-released.

## Parole process

Except for parolable lifers, for whom the process is more rigorous, release decisions are made by panels of three board members. A number of months before the prisoner's ERD, the board calculates the person's parole guidelines score. Institutional personnel prepare parole eligibility reports that itemize facts like the prisoner's misconduct history and whether required programs have been completed, but contain very little space for comment and none for recommendations. Depending on the parole guidelines score, the prisoner may be interviewed by one board member. Interviews are typically brief, often as short as 10 minutes. Although a friend or family member may attend the interview, the prisoner has no right to counsel. A second board member reviews the file. If the two members concur on whether parole should be granted, the third need not vote.

The panel decides whether to release the person when the ERD is reached or continue confinement. Continuances (often called "flops") may be for any period up to two years. If release is denied, the prisoner receives a written notice that is supposed to explain what he or she can do to improve the chances for release and when the next review will occur.

## Parole guidelines

Like the sentencing guidelines, the parole guidelines are required by statute. However, they are developed solely by the MDOC. They focus on the statistical probability that a prisoner will commit an assaultive offense if released.

Prisoners are awarded either positive or negative points on a series of factors. If the total score is +4 or greater, the person is rated "high probability for parole". A score that is below +4 but above −13 puts the prisoner in the average probability range. A score below −13 is low probability.

Some of the guidelines factors are dynamic ones that change over time, such as institutional conduct,

<hr />

1. The current MDOC Field Operations Administration is reversing this last trend by directing parole agents to use more community-based alternatives before recommending revocation to the board.

program participation, age and length of time served. However, the static or unchanging factors of offense and prior record are also weighted heavily and repeatedly. For instance, points are given both for "aggravating conditions" of the offense and for prior record. Additional points are given for the prisoner's "statistical risk", a series of categories that are, in turn, based largely on offense and prior record. See offenders automatically get yet another −5 points under "Mental Health Variables".

The situation was compounded nearly two years ago when the guidelines were revalidated. The scoring was adjusted so that anyone with more than 6 points for prior record who nonetheless scored high probability of release would automatically be pushed back into the average category. [2] As a result, the proportion of prisoners with scores in the high probability range dropped from nearly 49 percent to less than 37 percent.

With a high probability score, the board may, in most cases, release the prisoner without an interview. If it denies parole, the board must give "substantial and compelling reasons" for departing from the guidelines recommendation. If the prisoner scores in the average range, it also frequently uses a subjective assessment of the prisoner's thinking, such as insufficient remorse or minimizing participation in the offense.

If the prisoner scores low probability, the board may deny release without an interview. In these cases it must have substantial and compelling reasons for departing from the guidelines and granting parole.

For people who fall into the average probability category, the board has absolute discretion. While by statute it must articulate reasons for denying parole, these do not have to be substantial and compelling. Prisoners commonly receive notices denying parole with boilerplate language telling them that to improve their chances for release they should do what they have already done, such as keeping a clear conduct record and completing recommended programs.

Unlike the sentencing guidelines that judges must follow, there is no system for reviewing departures from the parole guidelines. In fact, there is virtually no review of board decisions at all, either judicial or administrative. [3] Thus the requirement that the board have substantial and compelling reasons for departing from the guidelines is unenforceable, and its exercise of discretion cannot be overturned, even for abuse. Moreover, prison capacity is not a factor the board is required to consider.

<hr />

2. Revalidation was done in part to insure an assaultive medximum rate for the high probability group of 5 percent or less. The overall scoring was not revamped, but the point is now considered "preliminary" and subject to adjustment if certain factors exist. In addition to the change noted above, prisoners who score in the average probability range are bumped into the high probability range if several conditions are met. Thus guidelines calculated after December 1, 2001 contain two scores—preliminary and adjusted.

Another change made by the board, independent of the revalidation study, was to add −20 points to the score of anyone housed at a maximum security facility. The purpose was to push all these prisoners into the low probability range so they could be denied release without interviews.

3. In 1999, at the parole board's urging, the Legislature abolished the right of prisoners to appeal parole denials to the circuit court which had reversal under the Corrections Code, although prosecutors and victims retain the right to appeal grants of parole. The right of prisoners to appeal under the major decisions (that governs administrative agency review generally) is currently being litigated. However, for all practical purposes, prisoners cannot obtain judicial review of a parole denial.



The high cost of denying parole: an analysis of prisoners eligible for release

The role the prisoner's offense should play in the release decision is a controversial subject. Citizens have an understandable fear, heightened by media coverage of isolated cases, that sexual and violent offenders will repeat their crimes. No parole board member wants to feel they could have prevented a horrific crime committed by a parolee. The board is also sensitive to the political consequences of high profile crimes by parolees, no matter how justified the decision to parole may have been. Such concerns make it easy to assert that everyone who committed an assaultive or sexual offense should simply be locked up for as long as possible.

However, at least six points tend to complicate this view.

1. All crimes of a general type are not equal. Assaultive offenses range from bar fights to premeditated murders. Sex offenses include prohibited sex between an 18-year-old male and a willing 15-year-old girl, as well as rape and child molestation.

2. The fact that someone committed a violent act years or decades ago does not logically mean they are violent today. That conclusion would ignore the effects of sheer aging and of any in-prison treatment programs or other rehabilitative influences.

3. While imposing longer sentences in the first instance may have some impact on reducing crime, there is no evidence that further lengthening incarceration by denying parole has any additional value for crime prevention. [8]

4. MDOC research does not support the conclusion that substantially decreased parole rates were necessary to prevent assaultive and sexual offenses by parolees. The *1994 MDOC Statistical Report* contains a four-year follow-up of people paroled in 1990, when the parole grant rate was 68 percent. The total failure rate on parole (including technical violations and new sentences) was 44 percent for property offenders and 36 percent for those who committed offenses against people. Looking only at those who received new sentences, the proportion was 22 percent of property offenders but only 12 percent for those with crimes against people. By either measure, homicide and criminal sexual conduct actually have the lowest recidivism rates of any major crime group.

When the focus is narrowed further to the number of parolees who committed new crimes against people it turns out to be very small:

Of these parolees, more than 93 percent did not commit another assaultive or sexual offense while on

### Crimes against people by parolees released in 1990

| Conviction Offense | Number of Parolees | New Crime Against o Person | |
|---|---|---|---|
| | Who Committed New Crime Against Person | Number | Percent |
| Homicide | 221 | 14 | 6.3 |
| Assault | 562 | 36 | 6.4 |
| Robbery | 731 | 63 | 8.6 |
| Criminal Sexual | | | |
| Conduct | 489 | 16 | 3.3 |
| **TOTAL** | **2,003** | **129** | **6.5** |

parole (typically within two years of their release). Although parole was always granted more cautiously to these offenders, the statistics suggest that denying parole across the board based on offense involves the continued incarceration of many people who will not re-offend.

5. While it is undisputed that offenders guilty of more serious crimes should serve longer sentences, this is already accomplished through the sentencing process. Sentences for assaultive and sexual offenses are typically much longer than those for property and drug offenses. In 2000, the MDOC reported that over 12,000 prisoners had either life sentences or minimum terms longer than 10 years. [9]

6. The nature of the offense is the primary basis of the minimum sentence imposed by the court. Sentencing is intended not only to punish but to deter future behavior. The prisoner who becomes eligible for parole has already served the term determined to be proportional to the specific offense by the sentencing court (now with the aid of legislative guidelines) and, perhaps, by the parties to a plea bargain. If the decision to incarcerate a person further is premised solely on the general nature of the offense (as opposed to unique offense details that might have predictive value), the prisoner is effectively being resentenced by the parole board.

The May 04 snapshot corroborates the parole board's own assertions that it is particularly disinclined to release offenders convicted of sexual crimes. When those being held past their ERD are compared to prisoners generally and to parolees, it is apparent that sex offenders, who comprise 20.3 percent of the total prisoner population, are grossly over-represented among those denied release (34.7 percent) and grossly under-represented among parolees (6.3 percent). Nearly 39 percent of all sex offenders currently in prison have been denied parole. At the other extreme, drug offenders, who comprise about 10 percent of all prisoners, are over 24 percent of the parolees. The proportion of non-assaultive offenders among parolees is also relatively high.

---

8. One review of the research concludes that prison expansion was responsible for about one-fourth of the national decline in violent crime during the 1990s. Other factors include: lower unemployment rates, changes in policing strategies and decreases in juvenile crime. Spelman, W., *The Limited Importance of Prison Expansion*, in Blumstein and Wallman, eds., *The Crime Drop in America* (Cambridge University Press, N.Y., 2000), p. 97. The author notes at page 117 that because burnout sets in most age groups, incarceration strategies that keep older inmates behind bars is beyond futile "imprisoning offenders who would have quit committing crimes had they simply been left alone."

9. These sentences are not substantially reduced by credit for good behavior. Generous good time provisions were abolished in 1978 and then replaced by disciplinary credits that could not exceed seven days per month. Truth-in-sentencing, adopted in 1998, then eliminated even the award of disciplinary credits on a prisoner's minimum term.

The picture of assaultive offenders is somewhat less clear. While they comprise a disproportionately low share of the parolees, they are also a lower proportion of those denied parole than might be expected. The proportion of all prisoners with assaultive offenses who have been denied parole (18.5 percent) is actually a bit lower than the proportion of non-assaultive offenders who have been denied (20.7 percent). The explanation for these apparent anomalies may lie with the number of assaultive offenders who are serving life or very long minimum terms. That is, the numbers may reflect the fact that assaultive offenders are relatively less likely to be parole eligible.

**Distribution of offenses by type among prisoner groups**

| | All Prisoners | Parole Denied | | Percent past ERD |
|---|---|---|---|---|
| Assaultive | | 4,224 / 37.6% | | 18.5% |
| Sex | | 3,898 / 34.7% | | 38.4% |
| Non-Assaultive | | 2,462 / 21.9% | | 20.7% |
| Drug | | 636 / 5.7% | | 13.2% |

The snapshot also reveals a good deal more about both the prisoners being denied parole and the board's decision-making criteria. The current median age of these prisoners is 35, just as it is for parolees. A third of the continued prisoners are over 40. However the median age at offense for these prisoners was 25, while it was 27 for parolees.

Age at offense correlates strongly with offense type. When looking at the prison population overall, three points are apparent. First, assaultive offenses are very much a youthful behavior. Over a third of all assaultive offenders were less than 21 when they committed their crimes and 77 percent were no older than 30. Second, of all crime categories, sexual offenders tend to be the oldest at the time of offense, with nearly half being older than 30. Third, after the age of 30, every type of crime declines with each passing decade. For assaultive and drug offenses, the sharpest drop is right after 30; non-assaultive and sex offenses drop most sharply after age 40. For every group but sex offenses, fewer than three percent of offenders were older than 50; for sex offenders it was fewer than seven percent.

**Age at offense by offense type for parole denials**

| | Sex | | Drug |
|---|---|---|---|
| <21 | 10.1% | | 20.8% |
| 21-30 | 32.2% | | 43.3% |
| 31-40 | 29.9% | | 23.3% |
| 41-50 | 12.9% | | 9.8% |
| >50 | 6.6% | | 2.6% |

The prisoners being held past their ERD actually have less extensive criminal records than any other group being examined. Of these prisoners, 36 percent had no prior felonies and 56 percent had no more than one. Among parolees, 50 percent had no more than one prior conviction. Among prisoners granted parole but not yet released, the figure was only 44 percent.

Not surprisingly, prior record also has a strong correlation with offense. Non-assaultive and drug offenders are given more chances before being sent to prison: assaultive and sexual offenders not only receive longer sentences, they are more likely to be given prison terms for a first offense. Thus, while over half of all sex offenders had no prior convictions, less than a quarter of the non-assaultive offenders had none.

**Prior felonies by offense type for parole denials**



| | Sex | | Drug |
|---|---|---|---|
| 0 | 51.8% | | 28.3% |
| 1 | 20.1% | | 18.9% |
| 2 | 11.6% | | 16.1% |
| 3 or more | 16.5% | | 26.7% |

Like prisoners generally (63 percent) and parolees (64 percent), 61 percent of the prisoners past their ERD were serving their first prison term.

Offense type is not the only determining factor in parole decisions. It appears from the data that behavior while incarcerated may be the parole board's threshold concern. The prisoners being denied

**Percentage having misconducts within preceding three years**

| | Parole Denied | Parole Granted |
|---|---|---|
| **Total Misconducts** | | |
| 0 | 25.0 | 42.5 |
| 1-2 | 22.4 | 33.2 |
| 3-5 | 18.1 | 15.0 |
| 6 or more | 34.6 | 9.3 |
| **Non-bonacide Misconducts** | | |
| 0 | 60.0 | 83.2 |
| 1 | 23.0 | 14.9 |
| 2 | 10.6 | 1.6 |
| 3 or more | 0.4 | |

in parole board practices, it is necessary to consider the possible reasons for the current practices.

One reason may be the fear of recidivism, given the high stakes if assaultive or sexual offenses reoccur. The question then is whether this fear is based on evidence or preconception. Absent a data-driven basis for assuming that these prisoners re-offend at significant rates, it is neither fair nor cost-effective to deny parole to them all in order to keep the risk that any one of them will re-offend at zero.

A second reason for low parole grant rates may be a fear the public will perceive the board as too lenient or irresponsible. It is understandable that appointed board members would wish to appear responsive to public concerns. However, this is essentially a political consideration that bears no relationship to whether a given individual or group of individuals actually poses a threat to public safety if released.

A third reason may simply be the personal reaction of parole board members to particular offenses and what they feel to be the appropriateness of the sentences imposed. If parole is denied simply because the board feels the offense warrants more time, no matter how long the prisoner has served or how good a candidate for release he or she is, the board's action can fairly be characterized as resentencing.

Clear data is particularly critical regarding sex offenders, in light of the near blanket denial of parole to this group. Views of sex offenses are especially complicated by the personal nature of the crime, changing social attitudes about sex, the vulnerability of the victims, and a lack of understanding of what causes the offender's behavior. This may lead to a failure to adequately distinguish among types of sex offenses and the amenability to treatment of various offenders. How different, for instance, is incest from pedophilia in terms of both public safety and the ability to change behavior? Does a single rape by a group of young males present different recidivism risks than rape committed by an older man acting alone? How many sexual offenses did not involve penetration? How many involved children and how many did not? How many of the perpetrators had been victims of sexual abuse themselves? Why does the parole board apparently distrust the sex offender treatment provided by the MDOC? Does the protocol lack measurable success or would virtually any treatment be viewed with skepticism? What tools are available to supervise and support sex offenders upon release and why are these presumed to be inadequate? Applying the answers to such questions on a case-by-case basis would yield more accurate individualized assessments and, presumably, more decisions to grant parole.

The parole board's task is a difficult one by any measure. It is also fraught with subjectivity. Thirteen years ago, a different board believed it met the statutory "reasonable assurance" standard by granting parole 68 percent of the time. The current board's 48 percent grant rate suggests a very different interpretation of what assurance is reasonable. Paroling fewer than a third of the more than 11,000 prisoners currently past their earliest release dates would arguably strike a reasonable and cost-effective balance between the two extremes.



## Prisoner Profile: Jan Borek No. 228729

**Offense:** Second-degree murder

**Sentence:** 5 to 25 years

**First possible parole date:** November, 1995

*Jan Borek is a citizen of the Czech Republic who will be deported as soon as he is paroled. Although he has no prior convictions, his institutional record is exemplary and psychological reports are positive, Borek has been denied parole repeatedly and is nearly eight years past his first release*

### Background and offense

Jan Borek was born and raised in the Czech Republic. In 1990, when he was 22, his mother married Mr. P., a Slovak-American whom she followed to the United States. At their mother's insistence, Borek and his younger brother, moved with her. For Borek, the move was to be temporary, since he wanted to study economics at Prague's Charles University.

According to Borek and his mother, Mr. P. was an alcoholic who became increasingly abusive to both mother and sons. Borek's mother wanted to return to the Czech Republic, but P. threatened to kill her if she tried to leave.

On February 7, 1991, Mr. P. discovered that his wife and step-children had arranged to flee his house. P., who had been drinking, started an argument with Borek that escalated into a fight. As Borek later explained to the court, P. grabbed a knife and Borek picked up a piece of metal from the fireplace. During the struggle, Borek gained control of the knife and stabbed Mr. P. Realizing that he had killed P., Borek panicked. He placed the body into the back of P.'s truck and, in the middle of the night, drove across the state looking for woods near Pentwater where P. had talked of hunting with friends. Somewhere in that area, he disposed of the body. Several weeks later, Borek told officers who were investigating Mr. P.'s disappearance what had occurred. Although he fully cooperated in efforts to recover Mr. P.'s body, it was never found.

Borek pled guilty to second-degree murder. Although Mr. P.'s family alleged that the killing was about obtaining money, not domestic abuse, there was no evidence to support this allegation. At the time of sentencing, Judge Jessica Cooper acknowledged that only Borek and his mother know for sure what happened, and that the body might never be found. Judge Cooper also observed that while a prison sentence was necessary, she was aware that Borek would be deported when his sentence was served. Believing "that the State of Michigan should [not] have to pay excessive costs" for incarcerating Borek, she imposed a term of 5-25 years.

Case 5:07-cv-15378-JCO-SDP   ECF No. 1-2, PageID.36   Filed 12/18/07   Page 36 of 43

## In-prison conduct

Borek now speaks and writes almost flawless English. By December 1997 he had earned, by correspondence, two associate degrees from Penn State University and a bachelor's degree from the Indiana Institute of Technology. He has worked tutoring other prisoners for almost eight years and has never had a single misconduct citation.

Psychological reports all portray Borek as a non-assaultive person who deeply regrets his part in Mr. P's death. A report done upon his arrival in prison states: "The prognosis upon return to the community is excellent that he will not repeat or be vulnerable for relapsing into crime." Subsequent evaluations describe Borek as "open and honest," "remorseful, and accepting of responsibility for his offense. In 1999, the MDOC's Director of Psychological Services advised the Czech Consul that Borek had not been accepted into assaultive offender therapy because he did not need it.

## Parole board actions

Borek became eligible for parole in November 1995. He has always scored "high probability of release" on the parole board's own guidelines, requiring the board to have "substantial and compelling reasons" to deny release. Czech officials have repeatedly informed the MDOC that they do not consider Borek a threat, and that they want him freed to return to his home country, where his mother now resides. If released, he would be deported immediately. Nonetheless, Borek has been interviewed by the parole board four times and each time it has continued him in prison for another 24 months.

The board has repeatedly taken the position that Borek is a risk to the community. Contrary to the psychological reports, it says that he avoids being open and honest about the offense, that he minimizes his responsibility, and that he has shown little remorse. The board characterizes the killing as having been "planned and carried out in a secretive manner."

The parole board has also placed substantial weight on the fact that Mr. P's body was never found, thereby hampering the police investigation. In 1998, the board said it: "...questions the necessity of Borek disposing of the body if his claim was in part self defense. The true injuries to the victim will never be known because the body has never been recovered." In 1999, it referred to disposing of the body as "destroying important evidence." In 2001, the board tersely concluded: "Prisoner is not able to say where the victim's body is located. It would be helpful in determining mitigating circumstances."

When Borek sought assistance from the United Nations, his case was thoroughly reviewed by the U.N. Working Group on Arbitrary Detention, which issued a lengthy opinion in 2000. After noting the parole board's "vast discretionary powers to determine the extent of actual sentence required" and the absence of appellate review, the Working Group concluded that Borek's continued

incarceration was arbitrary and in contravention of the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights. It asked the State of Michigan to not only remedy Borek's situation but to consider modifying its legislation governing parole, so as to bring it into conformity with international standards of justice.

Borek is currently undergoing parole board review once again.

## Questions

1. Why should Michigan citizens pay for the continued incarceration of someone who would be deported immediately if released?

2. Is it appropriate for the parole board to redetermine the facts of the offense and repeatedly deny release based on information fully considered by the prosecutor and sentencing judge?

3. Where the prisoner has admitted his guilt of second-degree murder, is the parole board taking on the role of police when it focuses on missing evidence and its desire to determine the "true injuries" to the victim?

4. What basis does the parole board have for consistently disagreeing with the assessments of MDOC psychologists about whether a person is remorseful, honest or at risk for re-offending?

5. Why is Jan Borek's exceptional record in prison inadequate to earn his release? Should the parole board be able to make him serve his maximum sentence based on the reasons it has used to deny parole to date?

## Parolable Lifers

The snapshot shows that over nine percent of the total prisoner population — 4,572 people — are "lifers." However, this broad statement marks an important distinction. Of this group, 2,629 are serving life without parole for first-degree murder. These prisoners can only be released if the Governor commutes their sentences or grants a pardon. The remaining lifers are parolable under the terms of MCL 791.234(6), also known as "the lifer law."

As noted earlier, in Michigan many of the more serious offenses, including second-degree murder, armed robbery, kidnapping, assault with intent to murder, drug possession or delivery of more than 650 grams, and first-degree criminal sexual conduct, carry a penalty of life or any term. This allows the trial judge either to select both a minimum and maximum term or to impose a sentence of life with the possibility of parole. Most parolable lifers who committed their offense before October 1, 1992 become eligible for parole after serving 10 calendar years. Those whose offenses were committed later must serve 15 years. Special rules apply to drug lifers who were originally sentenced to mandatory life without parole for delivering more than 650 grams and who now, as a result of mandatory amendments, must serve at least 15 years and may be required to serve up to 20, depending on specified circumstances. On May 6, 2003, there were 834 lifers who had served the requisite years and who had no additional sentences that would prevent their release.

The procedures for lifers are more rigorous than the norm. If a majority of the entire board has interest in proceeding, the sentencing judge (or that judge's successor) must be given 30 days to file a written objection. If there is no objection, the board must conduct a public hearing before it can make a final decision to grant parole.

Historically, the parole board first interviewed a lifer well before the 10-year eligibility date and regularly thereafter. Although the details changed several times, until 1992, each change kept increasing the frequency of lifer interviews. The stated purpose according to the MDOC's 1974 Annual Report (at p. 101) was "to get acquainted with the individual prior to the service of ten years and to offer any advice or help relative to achieving future parole." In 1992, the schedule was changed dramatically to require no interview until the lifer had served 10 years and subsequent interviews only every five years thereafter.

In 1999, at the parole board's urging, the requirement of any personal interview after the first one was eliminated. The board can simply look at an individual's file and decide whether it thinks a personal interview would be useful. If not, it can send a notice telling the person it will look at the file again in five more years. The board is not required to give reasons for these "no interest" decisions and it does not do so. Thus, after interviewing a lifer once, perhaps five years before the person is even eligible for release, the board can choose never to see the person face-to-face again. The file does not contain a parole guidelines score, since the board has decided the guidelines do not apply to lifers. The new review procedures are applied to all parolable lifers, regardless of when they were sentenced. A lifer has no right to appeal a board decision of "no interest."

The rate at which lifers within the board's jurisdiction are actually paroled has declined dramatically since the lifer law took effect in 1942. For several decades parolable lifers were released routinely, although the average number per year declined from 13.7 in the 1940s to 11.2 in the '50s, 12.4 in the '60s, 7.4 in the '70s, 4.9 in the '80s and 3.1 in the '90s. Thus in the decade of the 1960s, 124 lifers were paroled while only 31 were paroled in the 1990s.

The 75 percent decline in raw numbers does not tell the whole story. Without knowing how many lifers were actually eligible for parole in any given year, it is impossible to tell what the grant rate actually was. Since the pool of eligible lifers used to be far smaller, the proportion that used to be paroled was relatively much larger than the raw numbers suggest. For example, MDOC data indicates that by December 1973, of the 272 prisoners then serving life, only 18 had served 10 years. In 1974, 18 lifers were released, suggesting that everyone eligible for parole obtained it. They included 14 convicted of second-degree murder who had served an average of 14.5 years. In 1981, the 14 lifers who were released included 10 convicted of second-degree murder who had served an average of 14.3 years. Even commutations of mandatory life sentences for first-degree murder used to be common. In 1973 alone, there were 21.

Sentencing judges were aware of both the lifer law and past parole board practices when they selected life sentences. A report on a survey conducted in January 2002 by the Prisons and Corrections Section of the State Bar, entitled "What Should 'Parolable Life' Mean? Judges Respond to the Controversy", analyzes the responses of 95 current and retired judges from around the state. [11] The majority of respondents thought that parolable lifers would actually serve 20 years or less. Many believed life was less harsh than a 15-year minimum. Some noted that they gave life sentences, as opposed to very long minimum terms, when they wanted the defendant to receive parole consideration sooner. Two-thirds said that the availability of parole was a factor in their sentencing decisions and that the parole board's current position does not accurately reflect their intentions when they imposed parolable life terms.

The parole board's position is that "life means life." In material quoted in the survey report, the board has stated that the distinction between a mandatory life sentence and a parolable one is who makes the ultimate decision to release – the Governor or the board itself. Lifers face a "higher threshold... due to the nature of their sentence." Therefore "something exceptional must occur" to justify paroling a lifer.

Critics assert that the board's position eliminates what is supposed to be the real distinction between parolable and non-parolable life terms, that is, whether the prisoner receives meaningful individualized consideration for release after serving a set number of years. Critics also say the board's position nullifies the legislative intent underlying the lifer law, the actual intent of sentencing judges who relied on prior board policies, and the value of many plea bargains.

The offenses of the 834 lifers currently eligible for parole appear in the following chart:

---

11. The full report appears on the CAPPS website: www.capps-mi.org.



## The high cost of denying parole: an analysis of prisoners eligible for release

### Parolable lifers by offense

| | |
|---|---|
| Second-degree murder | 51.1% |
| Criminal sexual conduct | 18.7% |
| Armed robbery | 12.8% |
| Other assaultive crimes | 14.0% |
| Drugs >450 grams | 2.8% |
| Non-assaultive (nonviolent offenders) | 0.5% |
| | 100% |

To place these figures in some context, the *2000 MDOC Statistical Report* shows that of 3,470 people in prison for second-degree murder, 709 had been sentenced to parolable life terms. 545 had minimum terms longer than 25 years, and the remaining two-thirds (2,216 people) had minimum terms of 25 years or less. Over 1,000 had minimum term of 15 years or less. The average minimum term for those not sentenced to life was 21.8 years.

The same report shows that of 4,455 people in prison for armed robbery, 198 had been sentenced to parolable life terms and 164 had minimum terms longer than 25 years. The remaining 92 percent had minimum terms of 25 years or less, with 3,051 serving minimums of 10 years or less. The average for those not sentenced to life was 9.7 years.

These wide disparities in the sentences being served for violation of the same statute raise difficult questions. Did judges impose the life sentences only in the very worst cases or on the very worst offenders? Conversely, did judges impose life terms in the expectation that parole would occur in 12, 14, or 16 years? Or do the life sentences reflect differing approaches to sentencing by individual judges or by the trial courts in different counties? Whatever the sentencing judge's intentions may have been, since these lifers are parole eligible today, could they be safely released? In how many cases would judges prevent parole by lodging objections? What sentences would these lifers receive under today's sentencing guidelines? Statistical data cannot answer these questions fully, but it can shed some useful light.

The parole eligible lifers are much older than the prison population generally. Their median age is 49. Twelve percent (97 people) are more than 60 years old.

The lifers' greater age is related to one phenomenon. The average time served by those convicted of non-drug offenses is 22 years. Fifty-eight percent (471 people) have served more than 20 years. Thus well over half were sentenced not only before the current legislative sentencing guidelines took effect but also before the predecessor judicially-derived sentencing guidelines became effective in 1984. One-third (270 people) have served more than 25 years. That is, they were sentenced in the 1970s or earlier, when judges knew that lifers were commonly paroled. By comparison, only 365 people convicted of first-degree murder have served over 25 years to date. Ninety-seven members of the parole eligible group have served more than 30 years.

While the data is missing on 87 cases, it is clear that most of the non-drug lifers were relatively young when they committed their crimes, as tends to be true of assaultive offenders generally. Their median age was 24. Two-thirds were 28 or younger. Most striking is the fact that nearly 30 percent (218 people) were 20 years old or younger; 72 were ages 15 to 17.

## The high cost of denying parole: an analysis of prisoners eligible for release

It seems apparent that relatively few of these life terms were imposed because of the prisoner's prior criminal record. Because these prisoners have been incarcerated for so long, the database does not contain sufficient information to analyze their prior felony convictions. However, fully two-thirds are serving their first Michigan prison terms and 86 percent had served no more than one.

It is also apparent that the vast majority of these lifers are not being denied release based on their institutional conduct. By MDOC policy, lifers are not classified at Level I. However, over 87 percent of the currently parole-eligible lifers are classified at Level II. Over 45 percent had not had a single misconduct in the preceding three years; 73 percent had not had more than two, and 83 percent had not had any non-bondable misconducts. Lifers' misconduct histories compare favorably with those of prisoners granted parole and awaiting release.

The parolable lifers have no parole guidelines scores available as a basis for assessing their risk to the community if released. Given how the guidelines are weighted, however, it seems likely that many would score in the high probability for release range. They are, after all, older prisoners with many years served who have few misconduct citations and low security classifications.

A review of the parole eligible lifers by county of conviction also produces interesting results. The following table shows the top 12 counties in order of their contribution to the total prisoner population. It also shows each county's proportion of the eligible lifer population.

| | Prisoner population | | Parole-eligible lifers | |
|---|---|---|---|---|
| | Rank | Percentage | Rank | Percentage |
| Wayne | | 31.8 | | 41.0 |
| Oakland | | 9.8 | | 7.0 |
| Genesee | | 6.3 | | 5.1 |
| Kent | | 6.1 | | 4.2 |
| Macomb | | 3.8 | | 2.1 |
| Muskegon | | 3.3 | | 1.7 |
| Saginaw | | 3.3 | | 5.4 |
| Berrien | | 2.7 | | 4.3 |
| Kalamazoo | | 2.6 | | 3.6 |
| Ingham | | 2.5 | | 2.1 |
| Jackson | | 2.3 | | 1.2 |
| Washtenaw | | 2.2 | | 2.6 |

Some counties have a substantially different share of the parolable lifers than they do of the prisoner population generally. For instance, while Wayne County has by far the largest share of both groups, it has a much larger proportion of the lifers. The next five counties on the list all have a relatively smaller share of the lifers than they do of prisoners generally. Saginaw and Berrien both have a markedly larger share of the lifers than would be predicted from their proportion of the total population.

## Prisoner Profile: Gladys Wilson No. 157538



***Offense: Aiding & Abetting Armed Robbery***

***Sentence: Parolable life***

***Earliest possible release date: 1988***

*Gladys Wilson was 31 and a first-time offender in 1978 when she pled guilty to aiding and abetting an armed robbery. At the time she was sentenced to parolable life, the expectation was that she would be released shortly after serving ten years. However, 25 years later, Wilson is still in prison and has just been denied release for another five years.*

### Background and offense

Gladys Wilson pled guilty to aiding and abetting an armed robbery in 1978. She was the 31-year-old mother of an 11-year-old girl. She had worked at the same company for ten years and had no prior record. Her husband, who is now serving mandatory life without parole for ten years and killed the night manager. Wilson left her husband at the store knowing he planned to rob it and returned later that night to pick him up but had no idea he would kill someone. She cooperated with the police in her husband's prosecution.

At the time she pled guilty and received a parolable life sentence, everyone involved assumed she would not serve much more than 10 years. Under today's sentencing guidelines, Wilson's recommended minimum sentence would be between 9 and 15 years.

### In-prison conduct

As early as 1985, staff reported Wilson to be cooperative, mature and self-disciplined, and suggested that she should be given "early consideration" for release. A 1985 report stated that she "is well-respected by both prisoners and staff" and that she "has an excellent attitude and has attempted to make the best of a bad situation."

Wilson took full advantage of the programming available to her in prison. She earned 67 college credits with a cumulative grade point of 3.7. She also obtained a paralegal certificate. She has worked as a resident aide in a protective environment for mentally and physically impaired inmates, as a lab technician in the prison clinic, as a teacher's aide, tutor and administrative assistant. For several years, she served as trustee of an inmate trust fund and she volunteered to help set up and run the law library at Camp Gilman.

Today, Wilson is a middle-aged grandmother with many supporters anticipating her release. No one has ever suggested she is a threat to public safety.

---

These variations may simply reflect differences in the amount of serious crime in each county. However, they may also reflect differences in sentencing practices for similar crimes. If, for instance, in the 1970s, judges in some counties were imposing long minimum sentences for which a lot of good time credit was then available while judges in other counties were imposing life sentences on similarly situated defendants, the people with the long minimums would have been released years ago while the lifers are still incarcerated with no end in sight. To the extent that old disparities are perpetuating the sort of inequities that sentencing guidelines are now designed to prevent, they could be corrected by the board's exercise of individualized discretion.

### Conclusion

The data tends to support the view that carefully individualized assessments of parole-eligible lifers are more appropriate than an across-the-board presumption that "life means life." The age of the lifers themselves suggests they are long past the time when they are likely to be a danger to the community. The age of their convictions indicates that many sentences were imposed when judges believed that parole in fewer than 20 years was likely, assuming good institutional conduct. The fact that half the parolable lifers are serving for non-homicide offenses, that even most second-degree murder defendants do not receive life terms, and that only first-degree murder is not parolable by law suggest that making many of these people spend the rest of their lives in prison is unduly harsh. The disparities that appear to exist among similarly culpable prisoners sentenced at different times by different judges suggest the need for the parole board to perform a leveling function that only it has the capacity to perform.

Above all, perhaps, the age of the prisoners when they committed their offenses suggests a need for a thorough assessment of their current dangerousness. While there are undoubtedly individual exceptions, it seems unlikely that most judges who sentence youths in their late teens and early twenties to parolable life terms intend these young defendants to die in prison, regardless of how they mature or what they accomplish.

While parolable lifers are not the largest group of prisoners currently eligible for release, they are uniquely expensive. Each time parole is denied for five years, the decision costs taxpayers $112,515. If these 834 lifers must serve, on the average, another 25 years before they die in prison, the cost to taxpayers will be at least $469 million. In fact, as they age and develop medical problems, these lifers will become significantly more costly than that.

Warehousing an ever-growing number of lifers who could, by law, be paroled simply to enforce a philosophy that life should mean life, regardless of parole eligibility under the lifer law, has no apparent benefit to public safety. The public hearing and judicial objection procedures provided by statute are the extra safeguards the Legislature has determined to be adequate for reviewing lifers. The parole board's disinterest in applying its own parole guidelines to assess a lifer's actual risk of re-offending is difficult to fathom. Assessing each lifer, once he or she is within the board's jurisdiction, by the same criteria that are applied to similar offenders serving indeterminate terms would seem to be the more cost-effective approach.

## Methodology

The population examined in this study consisted of all prisoners and parolees under the jurisdiction of the State of Michigan as of May 6, 2003. The variable list was developed based on the original CAPPS proposal and subsequent reviews and discussions of the preliminary analysis. However, the first step in the process was obtaining a restructured database amenable to statistical analysis using a standard software package.

The CMIS (Corrections Management Information System) data is a convoluted and somewhat archaic COBAL data base that has evolved over time. It involves a series of "patches" to account for on-going changes to Michigan's complex sentencing structure as well as ongoing internal needs. Thus, the complex process of restructuring the database was an essential step to create a database that contained a single record of even length (uniformity) for each offender.

### Restructuring Details

The FOIA copy of CMIS spanned 7 data CDs on arrival. These 7 CDs are organized as one continuous database, smallest offender IDs on the first CD and largest offender IDs on the last CD. Each CD is written as a separate data file, so the first step was to concatenate the 7 files (each 600 megabytes) into one large 4 gigabyte database.

An additional complication is that each offender ID is made up of the various CMIS record types required to record the offender's characteristics and history with MDOC. As a result, not every offender requires all of the record types and those record types that are present may have more or less records than another offender's. In other words, there is no uniformity to the size and shape of each offender's information, so the next step was to separate the record types into individual files.

The following individual files each represented a specific record type as provided in the FOIA copy of CMIS: Masters, IDs, Sentences, Parole Board Actions, Transits, Misconducts, Parole Guidelines Entry and Parole Guidelines Score.

- Masters - multiple records for each offender are possible with each new record representing a new commitment event, identified by a prefix letter. Only the information from the most recent prefix was used for each offender. This record type contains a current status value, such as prisoner or parolee, as well as some demographic information about the offender.

- 1Ds - single record for each offender. This record also contains some demographic information about the offender.

- Sentences - multiple records for each offender are possible with each record representing the judge's sentence for the conviction offense. Sentences from prior completed incarcerations

are also possible. Only sentences active at the time the copy of CMIS was made were retained for combining. For information that wasn't reasonable to combine, such as the compiled law violated, information from the most severe sentence, typically the sentence that had the largest minimum term, was retained (with the largest maximum term breaking minimum term ties and the last entered sentence as the final tie-breaker.)

- Parole Board Actions (PBAs) - multiple records for each offender are possible with each record representing the Parole Board's decision whether to grant or deny parole. Information from the most recent PBA, the PBA related to the Parole Guidelines Score calculation, and the earliest PBA for the most recent commitment were retained.

- Transits (TRAs) - multiple records for each offender are possible with each record representing the offender's movement amongst MDOC locations. Information from the most recent TRA was retained and used to cross check the Master record's current status. Other specific TRAs since the most recent commitment were also retained, such as, the most recent commitment, the most recent movement to parole, and the most recent parole technical violation (PVT) movement.

- Misconducts - multiple records for each offender are possible. Due to the large volume of misconduct charge types, each charge type was separately totaled for the most recent three years since the offender's most recent commitment.

- Parole Guidelines Entry - multiple records for each offender are possible, however, only the most recent record was included with the copy. Only those records since the most recent commitment were retained. This record has valuable prior history and instant offense information, particularly for offenders who haven't had a parole board hearing yet.

- Parole Guidelines Score - multiple records for each offender are possible, however, only the most recent record was included with the copy. This record has valuable prior history and instant offense information, particularly for offenders who have had a parole board hearing.

Each individual record type had the offender's ID as a common link between them enabling reassembly of the retained record types into an analysis unit of uniform size and shape. The end result was a database of current prisoners and parolees that contained a single record with many, many characteristics for each offender.

### Method and analysis

The resulting "rectangular" data file permitted a more straightforward analytical approach using a standard software package for statistical analysis. The analysis for this study was conducted with SPSS, Statistical Package for the Social Sciences. SPSS was used for variable construction, transformations, descriptive statistics, group formations and a variety of between-group comparisons. Because

The high cost of denying parole: an analysis of prisoners eligible for release

the analysis used the entire population, the results basically consist of descriptive statistics.

The number of data records and data transformations was time-consuming and somewhat tedious, but a necessary step in creating the dataset and subsequent sub-files that could be more easily manipulated and analyzed to address the issues in the original proposal as well as secondary issues that evolved throughout the analysis. In all cases, subgroups were cross-verified against related variables to ensure they met the defined eligibility or inclusion criteria. For example, the process of identifying prisoners serving on a non-drug life sentence who are currently under Parole Board jurisdiction required a series of steps to determine eligibility. These steps included: 1) Identifying those prisoners serving a life sentence for a non-drug offense that occurred before October 1, 1992; 2) Excluding any prisoners in this sub-group that had a prior parole violation, were also serving on a mandatory life sentence or serving on an additional non drug life offense that occurred on or after October 1, 1992; 3) Finally, the remaining subgroup was matched against a complex sentence/time sequence that accounted for concurrent, consecutive and gun law sentences to determine eligibility. Eligibility for lifer subgroups was based on offense date and time served to determine Parole Board jurisdiction. The resulting subgroups were the basis for comparisons on key variables.

The original subgroups consisted of:

> Eligible prisoners serving a life sentence for a non-drug offense(s)
> Eligible prisoners serving a life sentence for a drug offense(s)
> Prisoners past their ERD with no prior parole violation and no current PB grant
> Prisoners past their ERD with a prior parole violation and no current grant
> Prisoners past their ERD with no prior parole violation and a current PB grant
> Prisoners past their ERD with a prior parole violation and a current PB grant
> Prisoners who have not reached their ERD
> Prisoners serving a life sentence who are not eligible

These subgroups were also combined into:

> Prisoners serving a life sentence and currently under Parole Board jurisdiction
> Prisoners past their ERD who do not have a prior parole violation but no current grant
> Prisoners past their ERD who have a parole violation and no current grant
> Prisoners past their ERD with a current Parole Board grant
> Prisoners who have not reached their ERD and lifers not under Parole Board jurisdiction.



The high cost of denying parole: an analysis of prisoners eligible for release

the analysis used the entire population, the results basically consist of descriptive statistics.

The number of data records and data transformations was time-consuming and somewhat tedious, but a necessary step in creating the dataset and subsequent sub-files that could be more easily manipulated and analyzed to address the issues in the original proposal as well as secondary issues that evolved throughout the analysis. In all cases, subgroups were cross-verified against related variables to ensure they met the defined eligibility or inclusion criteria. For example, the process of identifying prisoners serving on a non-drug life sentence who are currently under Parole Board jurisdiction required a series of steps to determine eligibility. These steps included: 1) Identifying those prisoners serving a life sentence for a non-drug offense that occurred before October 1, 1992; 2) Excluding any prisoners in this sub-group that had a prior parole violation, were also serving on a mandatory life sentence or serving on an additional non drug life offense that occurred on or after October 1, 1992; 3) Finally, the remaining subgroup was matched against a complex sentence/time sequence that accounted for concurrent, consecutive and gun law sentences to determine eligibility. Eligibility for lifer subgroups was based on offense date and time served to determine Parole Board jurisdiction. The resulting subgroups were the basis for comparisons on key variables.

The original subgroups consisted of:

> Eligible prisoners serving a life sentence for a nondrug offense(s)
> Eligible prisoners serving a life sentence for a drug offense(s)
> Prisoners past their ERD with no prior parole violation and no current PB grant
> Prisoners past their ERD with a prior parole violation and no current PB grant
> Prisoners past their ERD with no prior parole violation and a current PB grant
> Prisoners past their ERD with a prior parole violation and a current PB grant
> Prisoners who have not reached their ERD
> Prisoners serving a life sentence who are not eligible

These subgroups were also combined into:

> Prisoners serving a life sentence and currently under Parole Board jurisdiction
> Prisoners past their ERD who do not have a prior parole violation but no current grant
> Prisoners past their ERD who have a parole violation and no current grant
> Prisoners past their ERD with a current Parole Board grant
> Prisoners who have not reached their ERD and lifers not under Parole Board jurisdiction.

# CIVIL COVER SHEET FOR PRISONER CASES

| | | |
|---|---|---|
| **Case No.** 07-15378 | **Judge:** John Corbett O'Meara | **Magistrate Judge:** Steven D. Pepe |

| **Name of 1st Listed Plaintiff/Petitioner:** | **Name of 1st Listed Defendant/Respondent:** |
|---|---|
| Ramon Jackson | Barbara Sampson, et al |

| **Inmate Number:** 290867 | **Additional Information:** |
|---|---|

**Plaintiff/Petitioner's Attorney and Address Information:**

**Correctional Facility:**

Macomb Correctional Facility

34625 26 Mile Road
New Haven, MI 48048
MACOMB COUNTY

---

**BASIS OF JURISDICTION**

☐ 2 U.S. Government Defendant
☒ 3 Federal Question

**NATURE OF SUIT**

☐ 530 Habeas Corpus
☐ 540 Mandamus
☒ 550 Civil Rights
☐ 555 Prison Conditions

**ORIGIN**

☒ 1 Original Proceeding
☐ 5 Transferred from Another District Court
☐ Other:

**FEE STATUS**

☒ IFP *In Forma Pauperis*
☐ PD Paid

---

**PURSUANT TO LOCAL RULE 83.11**

1. **Is this a case that has been previously dismissed?**
   ☐ **Yes**          ☐ **No**
   ➢ **If yes, give the following information:**
   Court: _____
   Case No: _____
   Judge: _____

2. **Other than stated above, are there any pending or previously discontinued or dismissed companion cases in this or any other court, including state court? (Companion cases are matters in which it appears substantially similar evidence will be offered or the same or related parties are present and the cases arise out of the same transaction or occurrence.)**
   ☐ **Yes**          ☐ **No**
   ➢ **If yes, give the following information:**
   Court: _____
   Case No: _____
   Judge: _____